Beadell v Eros Mgt. Reality, LLC (2024 NY Slip Op 02496)

Beadell v Eros Mgt. Reality, LLC

2024 NY Slip Op 02496

Decided on May 07, 2024

Appellate Division, First Department

Pitt-Burke, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: May 07, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Anil C. Singh
Saliann Scarpulla Bahaati E. Pitt-Burke John R. Higgitt Kelly O'Neill Levy

Index No. 159152/17 Appeal No. 1354-1355 Case No. 2022-03454, 2023-03683 

[*1]Virginia Beadell et al., Respondents/Appellants,
v
Eros Management Reality, LLC et al., Appellants/Respondents, Wyndham Hotel Management, Inc., et al., Defendants.

Certain defendants appeal from the order of the Supreme Court, New York County (John J. Kelley, J.), entered July 12, 2022, which, insofar as appealed from as limited by the briefs, denied defendants Eros, Wyndham Hotel Management, Inc., Christian Aldoy, and TRYP Management, Inc.'s motion for summary judgment dismissing the complaint as against defendants Eros and TRYP. Plaintiffs separately appeal from an order, same court and Justice, entered June 9, 2023 which denied their motion for discovery sanctions to the extent the court did not strike defendants' answer.

Pollack, Pollack, Isaac & DeCicco LLP, New York (Brian J. Isaac and Paul H. Seidenstock of counsel), for appellants/respondents.
Mauro Lilling Naparty LLP, Woodbury (Seth M. Weinberg and Jonathan M. Turnbaugh of counsel), for respondents/appellants.

Pitt-Burke, J. 

In this appeal, we are asked to consider whether a hotel is subject to liability for failing to prevent a guest's suicide under a theory of assumed duty, where the hotel does not have custody or control of that guest but delays calling the police after a family member's request. We find that it is not. Here, defendants have met their prima facie burden as movants, establishing that they neither assumed a duty of care nor proximately caused injury to the decedent, and plaintiffs' experts' speculative and conclusory assertions that the hotel's delay in calling 911 caused decedent's suicide is insufficient to raise an issue of fact in response.
The events giving rise to plaintiffs' complaint center around a sequence of events that took place on May 26, 2017, prior to decedent's suicide. These events, which to the extent relevant to this appeal, are accepted as true and viewed in a light most favorable to plaintiffs. However, we address an important consideration before analyzing the facts and relevant law: the extent of knowledge each party was privy to in real time as the events unfolded. While it might seem unusual to begin an opinion with such a disclaimer, this consideration is expressly relevant because plaintiffs and the dissent focus on aspects of the record that were admittedly unknown to defendants at the time the incident was unfolding—decedent's prior history, diagnosis, and treatment for suicidal ideations, the multiple medications he was taking for anxiety and depression, and the content of the messages he sent to family members in the events leading up to this tragic incident. This information, as set forth in the facts below, is extensively relied on by the dissent to frame its argument regarding foreseeability. However, as noted in further detail below, its relevance to our disposition of this appeal is curtailed to the extent we find a duty to exist in the first instance (see Hamilton v Beretta U.S.A. Corp., 96 NY2d 222, 232 [2001]).
Decedent, the son and husband of plaintiffs Virginia Beadell and Kayla Greeninger, respectively, died by suicide while a guest at a hotel managed and operated by defendant [*2]TRYP Management, Inc. and owned by defendant Eros Management & Realty, LLC sued here as Eros Management Realty, LLC.
By way of a timeline, the sequence of events that plaintiffs contend resulted in defendants' assumption of a duty of care began when decedent's sister called the hotel at approximately 6:40 p.m. and indicated her concern that decedent was going to end his life. This call, however, was prompted by a sequence of communications that was largely unknown to defendants and therefore not indicative of its knowledge as the incident unfolded.
According to Ms. Greeninger, she received a series of text messages from decedent at some time prior to 5:43 p.m. Eastern Standard Time. These text messages, which Ms. Greeninger described as anxious and distressed, concerned the decedent's anxiety that she was not responding to his text messages. At 5:43 p.m., in response to these messages, Ms. Greeninger called decedent to see if he was ok, and to try and understand what was making him anxious. Notably, during this phone call, decedent seemed coherent, made no indications or threats that he was going to kill himself, and offered no indication that he had been drinking.[FN1]
Ms. Greeninger spoke to decedent again at 6:24 p.m. While she does not recall the exact subject matter of this call, as relevant here, she indicated that decedent seemed coherent and again did not threaten to kill himself.[FN2] Shortly after this phone call, however, decedent sent a photograph to Ms. Greeninger of his feet standing on a ledge looking down. After receiving this photograph, Ms. Greeninger immediately sent a text message to decedent's sister.
According to decedent's sister, she received a text message from Ms. Greeninger at approximately 6:29 p.m.,[FN3] indicating that decedent was going to harm himself, and describing that he was either on a ledge of a building or somewhere else and was going to jump. At approximately 6:40 p.m., decedent's sister called the hotel and spoke with the front desk agent. At the time of this call, decedent's sister had not received any text messages from decedent. However, she told the front desk agent that she was concerned decedent was going to end his life based on a text message she received from Ms. Greeninger. While decedent's sister indicated that she was unaware of decedent's location in the hotel, she conveyed that Ms. Greeninger informed her that decedent was on a ledge, or a roof of some sort, and they were concerned he was going to jump. She then requested the hotel check for his safety.
At approximately 6:43 p.m., decedent's sister called the hotel again and requested that staff go to decedent's room to check on him. Hotel staff then contacted decedent in his hotel room, at which time decedent indicated that he was fine and did not wish to be disturbed. At 6:46 p.m., hotel workers contacted decedent's sister and provided an update on their assessment of the situation, indicating that decedent was fine.
At approximately 7:00 p.m., decedent's [*3]sister received a series of text messages from decedent that she described as indicating he was in crisis, that he didn't want to live, that some people are depressed and anxious, and that he couldn't take it anymore. Decedent then asked his sister to tell the family goodbye and that they had done all they could for him.
At 7:12 p.m., and in response to decedent's text message, decedent's sister called the hotel, identified herself as a medical professional, and asked hotel workers to call the police and put decedent on a 72-hour hold. The hotel responded that they would contact the police.
At 7:21 p.m., Ms. Greeninger had a phone conversation with decedent. According to Ms. Greeninger, decedent was sad, distressed, crying, and saying his goodbyes to her. However, decedent did not say he was going to kill himself.
At 7:26 p.m., a hotel manager called decedent's sister and asked if she was sure that the police needed to be involved. At approximately the same time, Ms. Greeninger called the hotel and asked for an update. Hotel staff indicated they were on another line with decedent's sister, trying to get the police to check on the decedent. Ms. Greeninger expressed frustration with the hotel's update because decedent's sister had informed her via text message that she had requested the police be called prior to Ms. Greeninger's call to the hotel.
According to the incident report and police call logs, hotel staff called 911 at approximately 7:37 p.m. The assistant front office manager also went in person to the police station and brought several officers back to the hotel.
The group, which consisted of the police officers and hotel staff, reached the decedent's room in approximately five minutes. When they arrived, the decedent's hotel room door was closed and locked. The police officers knocked on decedent's door but did not receive a response. The building engineer was called to open the door and arrived at the room approximately 10 minutes later. The engineer opened the door, but it was locked from the inside with the door latch. To gain entry into the hotel room, the building engineer cut the door latch, a process that took approximately 10 to 15 minutes.
When officers entered decedent's room, they observed an empty bottle of alcohol, pill bottles and decedent on the window ledge just outside of the window. Officers engaged with decedent for approximately three minutes in an attempt to talk him back into the room. Unfortunately, their efforts were unsuccessful, and decedent jumped from the ledge.
Plaintiffs, individually and on behalf of decedent's estate, commenced this negligence and wrongful death action against defendants Eros, Wyndham Hotel Management, Inc., Christian Aldoy, and TRYP.[FN4] As relevant here, plaintiffs alleged, among other things, that defendants were negligent in failing to prevent decedent's suicide, that their negligence caused decedent's injuries and death because defendants failed to timely notify law enforcement [*4]authorities, and that defendants' negligence was the proximate cause of decedent's conscious pain and suffering, grave physical injuries, and untimely death.
Defendants moved for summary judgment dismissing the complaint, arguing, among other things, that Eros was not liable as an out-of-possession landowner and that neither Eros or TRYP was liable because they did not have a duty; they did not assume a duty; assuming there was such a duty, there was no breach; and any purported breach was not a proximate cause of the decedent's death. In support of their motion, defendants submitted the deposition transcripts of plaintiffs, decedent's sister Gillian Anderson, assistant front-office manager Leslie Tapia, bellman Ramon Marte, hotel representative Monica Sharma, New York City Police Department officer Bryan Kim, and detective Travis Duke. They also submitted, amongst other things, the incident reports generated by hotel staff present at the time of the incident, cell phone records of decedent and decedent's sister, decedent's autopsy report, and the expert affidavit of Donald Greene, a security management consultant. Greene opined that defendants acted reasonably under the circumstances.
Plaintiffs opposed the motion, arguing that defendants assumed a duty to prevent decedent's suicide, arguing, among other things, that defendants' failure to immediately call the police was a substantial factor in causing decedent's suicide. In support of their motion, plaintiffs submitted an affidavit from David Sherwyn, a hospitality human resources law professor; an affidavit from Steven Fayer, M.D., a licensed physician, board certified in psychology and neurology; and an affidavit from Hugh McGowan, Ph.D., an expert in criminal justice and law enforcement.
By order entered July 12, 2022, the court (John J. Kelley, J.) denied summary judgment dismissing the complaint against Eros and TRYP. As relevant here, the court held that defendants met their prima facie burden of demonstrating that they fulfilled their duty to decedent by checking in on him and eventually calling the police. However, the court found that plaintiffs raised triable issues of fact as to whether the delay in contacting the police was unreasonable and diminished the opportunity to prevent decedent's suicide.
Defendants appealed from the July 12, 2022 order. We now reverse, and grant defendants' motion for summary judgment dismissing the complaint against them.
Discussion
Duty
The dispositive issue in this case is whether defendants owed decedent a duty to prevent him from dying by suicide. On appeal, defendants argue that Supreme Court incorrectly determined that they assumed a duty of care to decedent and that plaintiffs raised triable issues of fact as to whether in assuming that duty, the delay in contacting the police was unreasonable and diminished the opportunity to prevent decedent's suicide.
An entity in control of a premises, "whether [it] be a landowner or a leaseholder, is [*5]not an insurer of the visitor's safety" (Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 519 [1980]). Absent a duty of care, there is no breach and no liability, regardless of how careless the conduct (see 532 Madison Ave. Gourmet Foods, Inc. v Finlandia Ctr., Inc. 96 NY2d 280, 289 [2001]; cf. Katz v United Synagogue of Conservative Judaism, 135 AD3d 458 [1st Dept 2016]).
In Cygan v New York (165 AD2d 58, 67 [1st Dept 1991]), this Court held that "[t]here are two situations where liability exists for the failure to prevent suicide." The first is "where a facility . . . which is in actual physical custody of an individual fails to take reasonable steps to prevent a reasonably foreseeable suicide" (id.; Gordon v City of New York, 70 NY2d 839 [1987] [where prison authorities knew or should have known that a prisoner has suicidal tendencies, a duty arises to provide reasonable care to assure that such harm does not occur]). The second is "where an institution or mental health professional with sufficient expertise to detect suicidal tendencies and with the control necessary to care for the person's well-being fails to take such steps" (Cygan, 165 AD2d at 67; Huntley v State of New York, 62 NY2d 134, 137 [1984] [where psychiatric hospital patient with a history of instability communicated her specific suicide plan involving an off-premises location to a hospital staff member, staff member had a duty to transmit such information to the staff psychiatrist so that he could consider whether the patient's privileges to leave the hospital unsupervised remained appropriate]).
Under these precepts, defendants, as the owner and operator of a hotel, owed no duty of care to decedent. As a guest of the hotel, decedent was not under defendants' actual physical custody or control (see Gordon, 70 NY2d at 841; cf. Ferrer v Riverbay Corp., 214 AD2d 312, 312 [1st Dept 1995]) and there is no evidence that defendants had any expertise to detect suicidal tendencies or the control necessary to care for the decedent's well-being (see Cygan, 165 AD2d at 67; Huntley, 62 NY2d at 137).
Plaintiffs, however, contend that defendants breached an assumed duty of care when they agreed to check on the decedent after being informed of his suicidal ideations and failed to act carefully or reasonably in contacting the police.
While "one who assumes a duty to act, even though gratuitously, may thereby become subject to the duty of acting carefully" (Nallan, 50 NY2d at 522), a defendant can only be held "liable for a breach of an assumed duty where the plaintiff shows reliance on the defendant's course of conduct, such that the defendant's conduct placed him or her in a more vulnerable position than he or she would otherwise have been in had the defendant done nothing" (Richardson v Lenox Terrace Dev. Assoc., 41 AD3d 108, 109 [1st Dept 2007] [internal quotation marks omitted]; see also Heard v City of New York, 82 NY2d 66, 73 [1993]). "In determining whether a cause of action lies in such [*6]instances, '[t]he query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument of good'" (Heard, 82 NY2d at 72, quoting Moch Co. v Rensselear Water Co., 247 NY 160 [1928]). 
"[I]n determining whether a duty exists, courts must be mindful of the precedential, and consequential, future effects of their rulings, and limit the legal consequences of wrongs to a controllable degree" (Hamilton, 96 NY2d at 232 [internal quotation marks omitted]). Plaintiffs' argument that the hotel assumed a duty of care to decedent is premised on the contention that plaintiffs relied on defendants' assurances and actions to check on decedent, but defendants' negligence placed decedent, not plaintiffs, in a more vulnerable position. Therefore, plaintiffs and the dissent contend that the duty assumed by defendants involved preventing the decedent's foreseeable suicide on their property.
Foreseeability, however, does not determine the existence of a duty, but rather, simply determines the scope of a duty once a duty is found to exist (Pulka v Edelman, 40 NY2d 781, 785 [1976]; Strauss v Belle Realty Co., 65 NY2d 399, 402 [1985]). Thus, "the existence and scope of a duty is a question of law requiring courts to balance sometimes competing public policy considerations" (Espinal v Melville Snow Contrs., 98 NY2d 136, 138 [2002]), the "reasonable expectations of [the] parties and society generally, the proliferation of claims, [and] the likelihood of unlimited or insurer-like liability" (Matter of New York City Asbestos Litig., 5 NY3d 486, 493 [2005] [internal quotation marks omitted]). 
As relevant here, plaintiffs' assert that defendants voluntarily assumed a duty to decedent based on a timeline of events that began when the first call was made to the hotel at 6:40 p.m. This timeline, however, can be narrowed down to two instances where plaintiffs argue that defendants breached their duty of care: when defendants agreed to check on decedent in his hotel room and based on his assurance that he was fine and indication that he did not want to be disturbed, they determined that decedent was not in need of emergency assistance; and when defendants agreed to call 911 at the request of decedent's sister but waited 25 minutes to call. Regardless of the starting point, however, both plaintiffs' and the dissent's [FN5] contentions are unavailing. 
Request to check on decedent
Giving plaintiffs the benefit of every possible inference, it is accepted as true that decedent's sister called the hotel at 6:40 p.m. and indicated that decedent was going to kill himself and had access to a balcony or ledge. The record also demonstrates that hotel room windows had locks and that no guests were present on any of the hotel balconies or the roof when the hotel staff checked upon the request of decedent's sister.
It is also undisputed that at approximately 6:43 [*7]p.m., decedent's sister called the hotel for a second time and requested that someone go to decedent's room to check on him. At decedent's sister's request, hotel staff went to decedent's room, which had a "do not disturb" sign on the door, and knocked on the door for approximately 15 minutes but did not receive a response. As the staff was returning to the elevator, they heard movement within the room and demanded decedent open the door. Decedent complied with the request, and upon his opening the door, hotel staff observed two empty liquor bottles and pill containers in decedent's room. Decedent, however, indicated that he was fine and asked not to be disturbed because he was watching television and taking a nap.
After this interaction, the hotel staff left decedent's room and upon returning to the front desk, called decedent's sister and advised that decedent appeared fine. Notably, this opinion was given by hotel staff, not a medical professional qualified to determine the risk of suicide (see Gillern v Mahoney, 154 AD3d 438, 439 [1st Dept 2017] ["[a]ny opinions rendered about medical attention being unnecessary were nonactionable gratuitous commentary"]).
Plaintiffs, however, contend that the hotel staff's conduct, in not immediately calling the police when they first contacted decedent, was not only illogical, but also placed decedent in a more vulnerable position than he would have been had defendants done nothing. Taken to its natural conclusion, plaintiffs' assertion is that the duty assumed was not to check on decedent and provide an update to plaintiffs, but rather to make a medical determination as to the likelihood of decedent's suicide or progression of his suicidal ideations.
The dissent agrees that defendants informed decedent's sister of their assessment, but notes that the hotel did not tell her about the liquor bottles or pill containers [FN6] in decedent's room. However, it is undisputed that, at the time of this call, decedent's sister had not requested that the police be called, had not yet identified herself as a medical professional, and importantly, had expressed a concern to defendants that decedent was on a ledge or a roof and that he was going to jump, which he was not.
Although the dissent finds that decedent's suicide was not merely foreseeable but was foreseen, it is not the duty of this Court to draw inferences in plaintiffs' favor based on factors unknown to defendants.[FN7] As the dissent concedes, defendants were not obligated to recognize or treat decedent's condition. To hold otherwise would be to find that the liability imposed on a facility that offers lodging to a person with suicidal ideations is equal to or greater than that imposed on a medical facility or professional that is qualified to make a determination of the risk of suicide and has the control necessary to care for a person's well-being (see Huntley, 62 NY2d 134 [1984]; Cygan, 165 AD2d at 67-68; see also Centeno v City of New York, 48 AD2d 812, 813 [*8][1st Dept 1975], affd 40 NY2d 932 [1976] ["The prediction of the future course of a mental illness is a professional judgment of high responsibility and in some instances it involves a measure of calculated risk" and if "liability were imposed on the physician or the State each time the prediction of future course of mental disease was wrong, few releases would ever be made and the hope of recovery and rehabilitation of a vast number of patients would be impeded and frustrated."]; Gallagher v Cayuga Med. Ctr., 151 AD3d 1349, 1351 [3d Dept 2017] ["[F]or a psychiatrist to be held liable for malpractice based upon a decision made in connection with a patient's treatment or a decision to discharge a patient from a hospital, it must be shown that the treatment decisions represented something less than a professional medical determination . . . or that the psychiatrist's decisions were not the product of a careful evaluation"]; Ozugowski v City of New York, 90 AD3d 875, 876 [2d Dept 2011] ["Should a psychiatrist fail to predict that a patient will harm himself or herself if released, the psychiatrist cannot be held liable for a mere error in professional judgment"]).
Phone call to police
The second instance of alleged assumed duty involves a phone call received by the hotel at approximately 7:12 p.m. in which decedent's sister identified herself as a mental health professional and reported that decedent's suicidal behavior had escalated. Decedent's sister asked the hotel to call the police immediately, but the hotel waited approximately 25 minutes before doing so. Curiously, decedent's sister indicated that she did not call the police herself because she was relying on the hotels assurances that they would do so.
Although the dissent posits that defendants failed to discharge their duty to call the police, record evidence settles any dispute as to whether defendants discharged this alleged duty. According to the incident report and police call logs, hotel staff called 911 at approximately 7:37 p.m. The assistant front office manager also went in person to the police station and brought several officers back to the hotel. Rather, plaintiff's argument focuses on whether this alleged duty was discharged in a timely fashion. In fact, by plaintiffs' own admission, their argument fails had defendant called 911 immediately (see generally Besedina v New York City Tr. Auth., 74 AD3d 857 [2d Dept 2010]).
After arriving at the hotel, the police officers reached the decedent's room in approximately five minutes. When they arrived, the decedent's hotel room door was closed and locked. The police officers knocked on decedent's door but did not receive a response. The building engineer was called to open the door and he arrived at the room approximately 10 minutes later. When the engineer opened the door, it was locked from the inside with the door latch. The building engineer then cut the door latch, a process that took approximately 10 to 15 minutes.
Upon entering [*9]decedent's room, the officers observed empty bottles of alcohol, pill bottles and decedent on the window ledge just outside of the window. While in decedent's room, the officers engaged with decedent for approximately three minutes in an attempt to talk him back into the room. Unfortunately, their efforts were unsuccessful, and decedent jumped from the ledge.
Relying on this Court's holding in Ferrer v Riverbay Corp. (214 AD2d 312 [1995]), plaintiffs argue that defendants breached their duty to take reasonable action to prevent the foreseeable risk of decedent's suicide. Specifically, plaintiffs contend that the hotel's representation to decedent's family exacerbated his risk of suicide because it led decedent's family not to contact the police directly or summon other aid or assistance. This argument is misplaced.
Like plaintiffs, the dissent contends that the duty to prevent a foreseeable suicide can be assumed. However, we find that the facts of this case do not fit within the crucial framework under which our precedent establishes that such an assumption can be demonstrated. In Ferrer, the defendants' officers were alleged to have isolated a 12-year-old sexual assault victim from her friends, placed her in a 26th-floor apartment, refused to allow her to call her mother, and verbally abused the victim until she agreed to press charges against her assailants (id.). The officers then left the victim unattended and tragically, she climbed over a window balcony and fell to her death (id.). Thus, this Court found triable issues of fact as to whether defendants had assumed a duty to care for or control decedent but negligently carried out those duties (id.).
This case on its facts is starkly distinguishable. Defendants, who were not officers, did not isolate or take control of the decedent or otherwise put him in a more vulnerable position than if the obligation had not been assumed. While the dissent highlights factors such as decedent's long history of suicidal behavior, that at 6:30 p.m. decedent sent Ms. Greeninger a photograph of himself on a high building, that he was threatening to jump off a building, that decedent's sister called him many times and left many messages in support of its assertion that defendants failed to satisfy their duty, these facts were indisputably unknown to defendants and therefore do not establish the requisite nexus that decedent's suicide was triggered by anything the hotel or its employees did or failed to do (see Malpeli v Yenna, 81 AD3d 607, 608-609 [2d Dept 2011] [even assuming the defendant agreed to monitor the driver, such conduct neither enhanced risk the plaintiff faced from activity in which he chose to participate, nor did it create new risk]; Gillern, 154 AD3d at 439 [the defendant's employees, "in assisting decedent and placing him in his wife's care, did not assume a duty, and nothing they did placed him in a worse or different position of danger"]).
The dissent also contends that the rarity [*10]of the facts in this case is demonstrated by the paucity of on-point case law. But it is plaintiffs attempt to bring the facts of this case outside of the normal strictures of New York State case law, which limit liability for the failure to prevent a suicide under the two circumstances noted above, that make this an issue of first impression for this Court.
Further, the dissent's contention that the parties have not cited one case in this country that involved comparable facts is belied by the record before this Court. In support of the underlying motion, defendants cite to the Georgia Court of Appeals' holding in La Quinta Inns, Inc. v Leech (289 Ga App 812 [2008], cert denied [2008]). While this decision is not controlling, the Georgia Court of Appeals' holding in La Quinta offers insight into the ultimate considerations before this Court. In La Quinta, the court found that plaintiff's theory that La Quinta hotel could have prevented decedent from jumping to his death if the hotel employee had responded differently to the crisis and help had reached him sooner, was "pure speculation" because undisputed evidence established that decedent "jumped out of the window only after help arrived" (La Quinta, 289 Ga App at 817 [emphasis in original]).
While the dissent attempts to distinguish this case based on the alleged foreseeability of decedent's suicide and the express promises made by the hotel, there is no evidence in the record of a promise by the hotel to do anything other than call the police, or that reliance on the defendants in doing so placed the decedent in a worse position than he would have been had they never assumed the duty to help (see Richardson, 41 AD3d at 109; but see Applewhite v Accuhealth, Inc., 21 NY3d 420, 431 [2013] [FN8]). To be clear: the decedent, an adult who was a registered guest occupying a hotel room, was on the ledge outside of his room before the hotel was first contacted. He had ready access to the ledge, during the time of the parties' communication and he was on the ledge when the police entered his room. Plainly, the decedent was in no worse position as a result of the hotels actions or inactions.
Therefore, we agree with Supreme Court that defendants established prima facie entitlement to summary judgment, in that they fulfilled their duty to decedent. Defendants demonstrated that hotel staff checked the roof and balconies after the initial phone call by decedent's sister and checked in on decedent after a subsequent call. Defendants also called the police and physically went to the nearby precinct to request that officers come to the hotel to check on decedent. Defendants' expert also opined that hotel staff acted reasonably and that there was no special relationship created between the hotel and decedent to ensure his safety against a suicidal act. On this record, defendants met their prima facie burden of establishing that they had no duty to prevent decedent's suicide. Similarly, if a duty to call the police [*11]can be deemed to have been assumed, defendants fulfilled their duty, and the police arrived at the hotel at least thirty minutes before this tragic incident. Defendants were therefore not the proximate cause of decedent's suicide (see Jones v City of New York, 32 AD3d 706 [1st Dept 2006] [defendant's moving papers made out prima facie case for judgment in its favor based on the deposition testimony of its agent, shifting burden to plaintiff]).
Finally, we highlight an important policy implication directly related to the dissent's argument that "[i]f defendants wished to avoid police involvement, they could have escaped this lawsuit with a mere refusal." While we agree that defendants could have escaped all liability at the outset by refusing to entertain decedent's sister's concerns, there must also be some articulable limit as to such liability for those facilities that choose to help and do not have custody or control of the individual in need. If we accept the dissent's argument, then any delay in contacting 911 in a circumstance involving suicidal ideations could be seen as a substantial factor to the outcome, no matter if the suicide is already in motion or law enforcement arrived before the departed dies by suicide. This simply is not the standard.
Proximate Cause
While the issue of causality is usually a factual matter left to the jury, plaintiffs' evidence must meet a minimum legal test of determining "whether [it] provides any valid line of reasoning and permissible inferences that could lead rational minds to the conclusion urged by plaintiff" (Heard v City of New York, 82 NY2d 66, 69 [1993] [internal quotation marks omitted]). Thus, we disagree with Supreme Court's finding that plaintiffs raised an issue of fact as to whether the delay in contacting the police was unreasonable and diminished the opportunity to prevent the decedent's suicide.
Here, defendants made a prima facie showing that it has not assumed a duty through action or inaction. In response, however, plaintiffs failed to raise an issue of fact as to whether the 25-minute delay in calling was a proximate cause of decedent's suicide (see Nieves v City of New York, 91 AD2d 938, 939 [1st Dept 1983]). Despite the dissent's attempt to distinguish the cases cited by the majority as off base, all governing precedent points to the same result. Whether a suicide, medical malpractice, or tort law, proximate cause cannot be established based on an expert's speculative testimony (see Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002]; Verderese v 3225 Realty Corp., 147 AD3d 637, 638 [1st Dept 2017]; Hotaling v City of New York, 55 AD3d 396, 397 [1st Dept 2008], affd 12 NY3d 862 [2009]; Timmins v Tishman Constr. Corp., 9 AD3d 62, 69-70 [1st Dept 2004], lv dismissed 4 NY3d 739 [2004]; Amatulli v Delhi Constr. Corp., 77 NY2d 525, 533, n 2 [1991] ["[w]here the expert states his conclusion unencumbered by any trace of facts or data, his testimony should be given no probative force [*12]whatsoever . . . [i]ndeed, no reason is apparent why his testimony should not simply be stricken"]). That this precedent does not align with the dissent's view of the case does not change the law.
As relevant here, in his affidavit, Dr. Fayer merely offers a host of speculative assertions concerning decedent's suicide. Namely, he opined that most suicides are preventable; that the subject suicide was likely preventable; that the time lapse of almost one hour from when decedent's sister first called to when 911 was called is a significant amount of time; that time is of the essence when it comes to suicide prevention; that even decedent being on a window ledge is not fait accomplifor suicide; if suicide was fait accompli, decedent would have just taken his life without texting his sister and wife; decedent's suicide attempt when he was 16 years of age was prevented, therefore it should have been prevented again; and that the delay in obtaining medical treatment is equivalent to a delay in obtaining medical treatment for one suffering a heart attack.
Dr. Fayer, however, has not stated a particularized factual basis for opining that the decedent's suicide was likely preventable, that decedent's prior suicide attempt was in any way indicative of the circumstances here, or that decedent texting Ms. Greeninger or his sister was indicative of the fact that his ideations could be reversed. Further, he could only speculate whether the delay in contacting the police denied the opportunity to prevent decedent's suicide (see Gallagher, 151 AD3d at 1354 [expert psychiatrist's affirmation that failed to provide any factual basis for his opinion or point to any medical guidelines was conclusory and lacking sufficient detail to raise a triable issue of fact]; Valdes v Brooks, 2023 WL 309611, 2023 US App LEXIS 1261, *5 [2d Cir Jan. 19, 2023, No. 21-2971-cv] [doctor's testimony that a coordination of care between two doctors would have prevented decedent's suicide was speculative, as it is unknowable as to whether communication between the two doctors would have resulted in a different outcome]).
Further, the dissent's reliance on Hernandez v New York City Health & Hosp. Corp. (129 AD3d 532 [1st Dept 2015]) is misplaced. Unlike Hernandez, where a consultation note indicated that the reattachment of plaintiff's partially severed finger was a possibility, and the expert's opinion was based on medical records produced and the proposition that earlier reattachment surgeries increase the odds of success, no such evidence was adduced here. While Dr. Fayer compares the treatment of suicidal ideations to that of a heart attack, a glaring omission from this affidavit is any reference to a standard of care or a foundation for any of the relevant opinions made (see Morillo v New York City Health & Hosps. Corp., 166 AD3d 525, 525 [1st Dept 2018] ["[p]laintiff's expert's opinion that, given the circumstances surrounding decedent's presence in LHC's emergency department for [*13]psychiatric evaluation, the decision to discharge him led to his death, is speculative"; Park v Kovachevich, 116 AD3d 182, 191 [1st Dept 2014], lv denied 23 NY3d 906 [2014] ["where the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation, . . . the opinion should be given no probative force and is insufficient to withstand summary judgment"]). Contrary to the dissent's contentions, without more, Dr. Fayer's assertions are speculative, conclusory, and insufficient as a matter of law to overcome the defendant's motion for summary judgment (see David v County of Suffolk, 1 NY3d 525 [2003] [expert affidavit that fails to establish the foundation or the source of the standards underlying the expert's conclusion not only lacks probative force but is also insufficient as a matter of law to overcome the defendant's motion for summary judgment]).
In addition, the affidavit of Dr. Hugh McGowan, plaintiffs' expert in criminal justice and law enforcement, is not only speculative, but is also belied by the record before this Court. Specifically, Dr. McGowan opined that failing to contact the police after decedent's sister's first call was a departure from the standard of care and had the hotel contacted police earlier, they would have found the decedent "still safely in his room, and not on the ledge" and could have more easily taken him into custody. While Dr. McGowan doesn't provide a basis for this opinion, or an explanation of the standard referenced (see Amatulli, 77 NY2d at 533, n 2; Hotaling, 55 AD3d at 398 [1st Dept 2008]; Jones, 32 AD3d at 707; see also Veccia v Clearmeadow Pistol Club, 300 AD2d 472 [2002] [defendant was entitled to summary judgment where, inter alia, plaintiff's expert "did not sufficiently identify any specific industry standard upon which he relied"]), the more compelling problem with this assertion is that the record before this Court shows that decedent was on the ledge before the hotel was contacted or asked to call 911, as evinced by the photographs he sent his family members. Not only is this evidence in direct contradiction with plaintiffs' experts' assertion, but it highlights the speculative nature of this affidavit.[FN9]
Similarly, the affidavit of David Sherwyn, plaintiffs' expert in hospitality and human resources, did not suffice to carry plaintiffs' burden. Sherwyn's claim that defendants violated industry standards by failing to have in-house security did not create a triable issue with respect to the existence of an accepted industry practice or standard because he failed to provide support for this assertion. He did not identify a published industry or professional standard upon which he relied, nor did he provide any evidence that such a practice had been generally accepted in the relevant industry (see Jones, 32 AD3d at 707; Veccia, 300 AD2d 472).
In light of the foregoing, plaintiffs have failed to raise an issue of fact as to whether such alleged negligence was the cause of decedent's [*14]death (see Nieves, 91 AD2d at 939 [expert trial testimony on causation was based on mere speculation]; Min Zhong v Matranga, 208 AD3d 439, 443 [1st Dept 2022] [opinion evidence must be based on facts in the record. An expert cannot speculate, guess, or reach their conclusion by assuming material facts not supported by the evidence]; Verderese, 147 AD3d at 638 [plaintiff's expert's averment that the absence of handrails violated good and accepted safe engineering practices was conclusory and without probative force and therefore failed to raise a triable issue of fact]; Jones, 32 AD3d 706-707; Morillo, 166 AD3d at 525; Park, 116 AD3d at 191).
This case is distinguishable from Sorrentino v Fireman (298 AD2d 333 [1st Dept 2002]), where plaintiffs raised an issue of fact as to whether a nearly 45-minute delay in calling 911 was the proximate cause of decedent's death based on their expert's testimony that after decedent's airway became obstructed, he had only 10 or 11 minutes before a lack of oxygen resulted in irreversible brain injury. Here, there is no non-speculative line of reasoning that could lead to the conclusion urged by plaintiffs (see also Sorrentino v Fireman, 13 AD3d 122, 124 [1st Dept 2004]). Specifically, the record on appeal clearly shows, and plaintiffs acknowledge, that despite defendants' delay in calling the police, a period of at least thirty minutes elapsed from the time the police entered the hotel and decedent jumped from the ledge in the police officer's presence.
Not only is this delay decidedly unaddressed by plaintiff's experts, but under these circumstances, even if we were to accept plaintiffs' argument that defendants were negligent, they have an insurmountable burden as to proximate cause because there is compelling evidence of other possible nonnegligent causes of the incident (Montas v JJC Constr. Corp., 92 AD3d 559, 560 [1st Dept 2012], affd 20 NY3d 1016 [2013]). That is, plaintiffs' proximate cause argument necessarily fails because it is just as reasonable that decedent's suicide was caused by the 30-minute period after the police were called by defendant, and any finding to the contrary would be mere speculation (id.; McNally v Sabban, 32 AD3d 340, 341 [1st Dept 2006]; J.E. v Beth Israel Hosp., 295 AD2d 281, 284 [1st Dept 2002], lv denied 99 NY2d 507 [2003]; Sawh v Schoen, 215 AD2d 291, 293 [1995] ["[r]ank speculation is no substitute for evidentiary proof in admissible form that is required to establish the existence of a material issue of fact and, thus, defeat a motion for summary judgment"], quoting Tungsupong v Bronx-Lebanon Hosp. Ctr., 213 AD2d 236, 238 [1995]).
During this time, police officers engaged with decedent and attempted to persuade him to come back into his room (see Poree v New York City Hous. Auth., 139 AD3d 528, 528-529 [1st Dept 2016] [any negligence by defendant was not a proximate cause of plaintiff's injuries because plaintiff acknowledged that he had time to exit the apartment without [*15]injury but elected to try to extinguish the flames by grabbing and shaking the burning tree]; Alloway v 715 Riverside Dr., 298 AD2d 148, 149 [1st Dept 2002]). The dissent suggests that our reference to Poree and Alloway in support of this assertion is afield. However, the principles of proximate causation require that any negligence impact the outcome of the results. While it is a terrible circumstance that their efforts were unsuccessful, plaintiffs' experts' mere speculation that had police officers arrived sooner, defendant's suicide would have likely been preventable, failed to raise a triable issue of fact to refute defendants' prima facie showing that they fulfilled their duty to decedent (see McNally, 32 AD3d at 341 [even when there is no requirement for the plaintiff to exclude every other possible cause other than a defendant's breach of duty, "the record must render the other possible causes sufficiently remote to enable the trier of fact to reach a verdict based upon the logical inferences to be drawn from the evidence, not upon speculation"]).
Conclusion Accordingly, the order of the Supreme Court, New York County (John J. Kelley, J.), entered July 12, 2022, which, insofar as appealed from as limited by the briefs, denied defendants Eros, Wyndham Hotel Management, Inc., Christian Aldoy, and TRYP Management, Inc.'s motion for summary judgment dismissing the complaint as against Eros and TRYP, should be reversed, on the law, without costs, the motion granted, and the complaint dismissed. The Clerk is directed to enter judgement accordingly. The order of the same court and Justice, entered June 9, 2023, which, insofar as appealed from as limited by the briefs, denied plaintiffs' motion for discovery sanctions insofar as it declined to strike defendants' answer, should be dismissed, without costs, as moot.
All concur except Singh J.P., who dissents in an Opinion.
SINGH, J.P., dissenting. Noah Beadell was a doctor staying at defendants' hotel. Hotel staff were told that Beadell was suicidal. They saw that he had been crying, surrounded by empty liquor bottles, but told his sister that he appeared fine. He was not, as his contemporaneous text messages to his family soon made clear. His sister implored the Hotel to call the police. Hotel staff repeatedly promised that they would but waited almost half an hour to do so. It took roughly another 25 minutes for police to enter Beadell's room. He was on the ledge outside. Police attempted to talk him back in off the ledge. He jumped. He died.
The majority finds that defendants had no duty to Beadell or his family, and that no reasonable jury could find defendants' tardiness to have caused Beadell's death. In doing so, the majority inappropriately resolves factual issues on this motion for summary judgment (see Lebedev v Blavatnik,193 AD3d 175, 182 [1st Dept 2021] ["The court's role on a motion for summary judgment is issue-finding, not issue-determination[*16]"], citing Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957]; see also PF2 Sec. Evaluation, Inc. v Fillebeen, 211 AD3d 515, 515-516 [1st Dept 2022] [denying motion because "to make credibility determinations . . . is not the court's function on a motion for summary judgment"]).
The majority's apparent concern that an affirmance would impose liability for any suicide in a hotel is misplaced. Defendants were not asked to recognize or treat Beadell's condition; they were obligated only to fulfill a commitment that they voluntarily undertook — to call the police. They did not. A reasonable jury could find that defendants' failure to discharge that duty was negligent and caused plaintiffs harm. I respectfully dissent and would affirm the denial of summary judgment.
Facts
 There is little dispute over the facts. Where there is a dispute, "facts must be considered in the light most favorable to the non-moving party" (Lebedev,193 AD3d at 182, quoting Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011]), "and all reasonable inferences must be drawn in favor of the nonmoving party" (Prendergast v New York City Tr. Auth., 220 AD3d 583, 584 [1st Dept 2023]).
Defendant Eros Management was the owner of the TRYP Hotel. Defendant HCS Hospitality, Inc., was the managing agent for the TRYP Hotel. The Hotel, which did not have a security department, is located right next to the NYPD's Midtown South Precinct.
Beadell had a long history of suicidal behavior. Beadell's widow, plaintiff Kayla Greeniger,[FN10] testified that Beadell was staying alone in New York for a medical convention. At around 5:30 p.m. in Nebraska, Beadell sent her a picture of himself on a high building. She immediately contacted Beadell's sister, plaintiff Gabrielle Anderson, who was in Minnesota. Anderson testified that, at approximately that time, she received a text message from Greeniger that Beadell was threatening to jump off a building. Anderson called Beadell many times, but he never answered, so she left voice messages and sent him texts.
Anderson then called the TRYP Hotel, at 6:40 p.m.,1 [FN1] and spoke to someone named Kelsey. According to Anderson's testimony, she told Kelsey that Beadell was staying at the Hotel and that she was concerned he would kill himself, specifically by jumping off a ledge or a roof. She asked Kelsey to send security to check on him, which Kelsey said she would do. The Hotel's own incident report states that Kelsey went to check on Beadell with another employee, Ramon, because his sister thought he would commit suicide. According to the incident report, Beadell told them he was fine but seemed as if he had been drinking and crying, and they saw pill containers and empty liquor bottles. Another Hotel employee, Leslie, testified that Anderson called back before they were able to return. The Hotel then called her back at 6:46 p.m. Although there is some disagreement as to the precise wording of this call, all agree that the Hotel did not inform Anderson [*17]about the liquor bottles or pill containers, but rather said that Beadell "was OK" or "appeared fine."1 [FN2]
Beadell's condition deteriorated. He sent two text messages to Anderson, at 7:00 p.m. and 7:12 p.m. According to Anderson, the second — which she described as "the scariest text [she] had ever gotten" — asked her to tell their family goodbye. She called the Hotel at 7:12 p.m., identified herself as a mental health professional, informed the Hotel that the situation had escalated, and requested immediate notification of the police. Anderson testified that "Kelsey said she would contact police immediately." At this time, Greeniger was in contact with Beadell, trying to calm him down. Beadell also continued to respond to Anderson's text messages, which begged him not to kill himself.
Twice more, Hotel staff spoke with one of the plaintiffs, who both insisted that they call the police immediately. According to police records, defendants did not actually contact them until 7:37 p.m., when Leslie visited the police station in person. Both Anderson and Greeniger testified that they did not call the police themselves because they thought the Hotel had already done so.
By the time police arrived, it was already too late: Beadell was on the window ledge; police were not able to talk him back into the room; and Beadell took his own life.
Discussion
Defendants assumed — and violated — a duty to call the police immediately
Plaintiffs do not seek to impose unlimited liability on hotels for failure to foresee and prevent every suicide. This is not a disguised suit for medical malpractice. Plaintiffs argue only that defendants assumed, and breached, a narrower duty. The rarity of facts like these is demonstrated by the paucity of on-point case law. Plaintiffs have not cited one case, from anywhere in the country, that involved similar facts.1 [FN3] The majority claims to finds insight in La Quinta Inns, Inc. v Leech (289 Ga App 812 [2008], cert denied [2008]), cited by defendants, although whether as to duty or causation is not clear. Yet, the facts in La Quinta Inns are in stark contrast to those here. In this case, resolving all inferences in favor of the nonmoving parties, the Hotel staff pledged to call 911 after being told that a guest was at imminent risk of suicide. By comparison, the defendants in La Quinta Inns never promised to call 911 (see id. at 814). Neither did they observe any suicidal behavior on the part of the decedent, or believe that he was intoxicated or depressed, until 15 minutes before they called the police (id. at 814-815). Indeed, even the plaintiffs thought him to have no history of depression or threats of suicide (id. at 814).
However it might fare in Georgia, plaintiffs' theory is well-grounded in New York jurisprudence. Black-letter law shows that a person who voluntarily undertakes a duty must not be negligent in executing that duty (see e.g. Mirza v Metropolitan Life Ins. Co., 2 AD3d 808,809 [2d Dept 2003]["One who assumes a [*18]duty to act, even though gratuitously, may thereby become subject to the duty of acting carefully"], quoting Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 522 [1980]; Lee S. Kreindler et al., New York Law of Torts § 6:14 [West's NY Prac Series, Aug. 2023 update] ["Even when no original duty is owed to the plaintiff, once a defendant undertakes to perform an act for the plaintiff's benefit, the act must be performed with due care for the safety of plaintiff"]). The duties that can be assumed include prevention of reasonably foreseeable suicides (see Ferrer v Riverbay Corp., 214 AD2d 312 [1st Dept 1995]).
One long-established way to assume such a duty is to promise assistance or protection, causing others to forgo precautions or withhold their own aid (see Applewhite v Accuhealth, Inc., 21 NY3d 420,431 [2013] [EMTs' assurances in performing CPR and awaiting an ambulance prevented mother from transporting injured child to nearby hospital]; Bardio v Rego II Borrower, LLC, 213 AD3d 626, 629 [2d Dept 2023] [security guard acceded to the plaintiff's request to help her find her car]; Xenias v City of New York, 191 AD3d 453, 453-454 [1st Dept 2021] [911 operator assured the plaintiff "we are on our way," preventing the plaintiff from taking additional actions to secure help]; Pascucci v Board of Educ. of City of N.Y., 305 AD2d 103, 105 [1st Dept 2003] [secretary acknowledged the plaintiff's request for assistance, implicitly promising to act on the plaintiff's behalf]; Bloom v City of New York, 123 AD2d 594 [2d Dept 1986] [security guard accompanied teacher to scene of confrontation but took no action]; see also Nallan, 50 NY2d at 522-523 [finding evidence that members of the public would foreseeably rely on performance by hotel and tailor their conduct accordingly]).
This "ancient learning" compels denial of defendants' motion (Moch Co. v Rensselaer Water Co., 247 NY 160, 167 [1928]). Beadell's suicide was not merely foreseeable but foreseen. Defendants told plaintiffs that they would call the police to prevent that suicide. Plaintiffs — who were in other states and could not have physically coordinated with officers at the scene — testified that they did not contact the NYPD because they relied on the Hotel staff to do so. A jury could find that, had the police been called earlier and told that a suicidal guest was in need of aid, officers likely would have arrived earlier. Thus, defendants' actions may have delayed the provision of necessary care (compare Gillern v Mahoney, 154 AD3d 438 [1st Dept 2017][calling the decedent's wife and helping the decedent into car did not place the decedent in a worse position]; Malpelli v Yenna, 81 AD3d 607 [2d Dept 2011] [the defendant's agreement to monitor the driver did not put the plaintiff in worse position than had he not agreed to do so]).
The majority asserts that reliance on lawsuits against municipalities is misplaced. This objection holds little water, because the reasoning in these cases is analogous, [*19]in that it addresses "an assumption . . . of an affirmative duty to act" and "justifiable reliance on [that] affirmative undertaking" (Koyko v City of New York, 189 AD3d 811, 812 [2d Dept 2020], appeal dismissed 36 NY3d 1114 [2020], quoting Cuffy v City of New York, 69 NY2d 255, 260 [1987]; see Nallan, 50 NY2d at 522, citing Florence v Goldberg, 44 NY2d 189, 196-197 [1978] [addressing whether police department assumed a duty]). The majority implicitly concedes as much when it claims that plaintiffs could not establish reliance, although it fails to explain why not (but see Koyko, 189 AD3d at 813 [finding without explanation that, "on this record," the plaintiff was not induced to rely on representations to the decedent's detriment]). Neither of the policy reasons behind the limitations on municipal liability supports limiting the liability of private defendants. The asserted duty was owed to plaintiffs and Beadell specifically, not to the public as a whole, and private entities' deployment of resources is not a matter of legislative discretion (see Kircher v City of Jamestown, 74 NY2d 251, 256 [1989]). Plaintiffs also had direct contact with defendants and, if we consider Beadell the beneficiary of any duty, the requirement of direct contact may well be excused given that plaintiffs were far from "complete strangers" to him (id. at 257; see Cuffy, 69 NY2d at 262-263 [excusing direct contact by wife where her husband had sought, and been promised, police protection for her]; see also id. at 261-262 [direct contact was excused when party contacted the police solely to obtain protection for a helpless individual with whom she had a close relationship]). Regardless, there is no requirement of direct contact for one private party to assume a duty to another (see e.g. Nallan, 50 NY2d at 522-523 [finding possible liability if plaintiff "was familiar with the building's after-hours procedures and expected that an attendant would be present," not if such knowledge was directly communicated to plaintiff]).
The majority additionally objects that much of Beadell's medical history was unknown to defendants. This objection conflates duty with causation. As we can all agree, even if defendants had known Beadell's full history, no duty could be imposed by defendants' first-hand knowledge of his condition. Hotel staff are not required to independently recognize and respond to indicia of suicidality. Rather, a duty can be imposed by a promise to call the police. Perhaps a jury could find that promise alone sufficient to impose a duty. If not, it becomes significant that defendants were unambiguously informed by decedent's family — one of whom identified herself as a mental health professional — that decedent was at risk of suicide. Certainly, when we also consider defendants' own observations of Beadell, and the assurances allegedly made by the Hotel staff, it would be reasonable for a factfinder to conclude that a duty was assumed. Whether plaintiffs justifiably [*20]relied on Hotel staff to their detriment, and whether defendants assumed a duty, are questions for a jury and not the majority (see Applewhite, 21 NY3d at 431; Bardio, 213 AD3d at 629; Pascucci, 305 AD2d at 105).
Defendants have also failed to establish as a matter of law that they reasonably performed any duty they assumed. It is not clear to me that reasonableness in this situation is the province of an expert, rather than a jury. Regardless, the conclusory opinion of defendants' security management expert, Donald Greene, does not establish the reasonableness of defendants' delay in calling the police. Most significantly, Greene does not address the facts to which plaintiffs testified. Instead, he states that Hotel staff informed the police "[p]romptly." Plaintiffs claim — and a jury could find — that the actions of defendants' employees were anything but prompt. As the majority correctly emphasizes, an expert's testimony must rely on facts in evidence (see e.g. Min Zhong v Matranga, 208 AD3d 439, 443 [1st Dept 2022]["It is essential that the facts upon which the opinion is based be established, or fairly inferable, from the evidence"], affd 39 NY3d 1053 [2023]). Greene's opinion, which is not based on the evidence, is insufficient to make out a prima facie case.
Even if Greene's assertion sufficed to establish a prima facie case, which is highly debatable, plaintiffs rebutted it with the testimony of their own expert. Professor David Sherwyn, an expert in hospitality, explained the bases of his familiarity with the industry standards of reasonable care regarding guest safety. Professor Sherwyn acknowledged the delay and opined that, according to the standard of care for a hotel without security, defendants acted unreasonably in failing to contact the police "immediately." At the very least, based on the competing expert affidavits, plaintiffs have raised an issue of fact (see e.g. Sason v Dykes Lbr. Co., Inc., 221 AD3d 491, 492 [1st Dept 2023] [affirming denial of summary judgment because competing expert opinions "constituted the classic 'battle of the experts' "]).
If defendants wished to avoid police involvement, they could have escaped this lawsuit with a mere refusal. Plaintiffs then would have known to contact the police themselves. A jury could find that defendants assumed a duty to contact the police and failed to execute that duty with due care.
Defendants' breach of duty proximately caused Beadell's suicide
Nevertheless, the majority concludes that defendants are not liable because their delay in responding was not a proximate cause of Beadell's death. Although perhaps a closer question, a jury could find otherwise.
The majority's reasoning reverses the burden of proof. At this stage, plaintiffs are not required to prove that Beadell would certainly be alive but for the delay. Such a burden is stricter than they would bear at trial (see Brown v State of New York, 31 NY3d 514, 520 [2018] ["We have never required accident victims [*21]to identify a specific remedy and prove it would have been timely implemented and prevented the accident"]). Even analogizing to medical malpractice law, such certainty would not be required (see generally King v St. Barnabas Hosp., 87 AD3d 238, 245 [1st Dept 2011]). Rather, to earn summary judgment, defendants must prove — irrefutably — that their delay was not a "substantial cause" of Beadell's death (Hain v Jamison, 28 NY3d 524, 528-529 [2016], quoting Mazella v Beals, 27 NY3d 694, 706 [2016]; see Dunham v Village of Canisteo, 303 NY 498, 504-506 [1952] [reversing judgment as a matter of law for the defendants, because the jury could infer that 18 hour delay in calling for medical assistance was a proximate cause of death]; King, 87 AD3d at 245-246 [reversing summary judgment for defendants who may have improperly and tardily treated the patient, although the patient might have died despite proper treatment]; see also Brown, 31 NY3d at 520 [requiring the plaintiff ultimately to show that alleged negligence "contributed to the happening of the accident by materially increasing the risk, or by greatly increasing the probability of its occurrence"]).
Proximate causation is fact-specific and, absent truly extraordinary circumstances, should be determined by the factfinder (see Hain, 28 NY3d at 528-530; Turturro v City of New York, 28 NY3d 469, 483-484 [2016]). There are no such circumstances here. To the contrary, although defendants did not know the details of his medical history, they were specifically warned that Beadell would die precisely as he did. "The very same risk that rendered negligent [defendants'] alleged failure . . . was, in fact, the risk that came to fruition" (Hain, 28 NY3dat 533; see Brown, 31 NY3d at520 ["Where, as here, the risk of harm created by the defendant corresponds to the harm that actually resulted, we cannot say that proximate cause is lacking as a matter of law"]). The Court of Appeals has found less predictable harms foreseeable enough to support a verdict for plaintiffs (see Hain, 28 NY3d at 533-534[denying summary judgment against farm that allowed calf to escape, because it was foreseeable that someone might stop to assist it and then be hit by a car]; Turturro, 28 NY3d at 484-485 [upholding jury verdict against city, because jury could find that city's failure to study and implement traffic calming measures was a substantial factor in causing vehicular accident]).
Significantly, neither have defendants put forth any expert opinion that Beadell's suicide could not have been prevented (compare Hernandez v New York City Health & Hosp. Corp., 129 AD3d 532, 532 [1st Dept 2015] [finding prima facie showing in medical malpractice case because the defendant submitted expert opinion that its delay did not cause the loss]). Instead, defendants merely speculate — and the majority adopts this speculation — that earlier attempts to prevent the suicide might have failed. It is always possible that timely intervention would [*22]have been futile, yet delaying that intervention incurs liability nevertheless (see Dunham, 303 NY at 504, 506; Hernandez, 129 AD3d at 532 [finding issue of fact where expert opined that delay in medical treatment "diminished plaintiff's chance of a better outcome"]; King, 87 AD3d at 246 [declining to excuse negligence because "decedent . . . was in some sense destined to die"]). Perhaps defendants' speculation would be adequate under Georgia law, relied upon by the majority and defendants, which holds that "suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability" (La Quinta Inns, 289 Ga App at 816, quoting Dry Storage Corp. v Piscopo, 249 Ga App 898, 900 [2001]). New York law is diametrically opposed (see Fuller v Preis, 35 NY2d 425, 429 [1974] ["(T)he act of suicide, as a matter of law, is not a superseding cause in negligence law precluding liability"]; Ferrer, 214 AD2d at 312 [finding foreseeability of suicide an issue for the jury]; see also Feldman v Port Auth. of N.Y. & N.J., 194 AD3d 137,142 [1st Dept 2021] [finding suicides to be foreseeable harm giving rise to duty]).
The majority's reliance on Montas v JJC Constr. Corp. (92 AD3d 559 [1st Dept 2012], affd 20 NY3d 1016 [2013]) again illustrates its reversal of the burden of proof. In Montas, which addressed a motion for directed verdict after trial, the burden was not on defendant to rebut causation but on plaintiff to show it (see id. at 560). Procedural errors notwithstanding, this is not a case where "there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other" (id., quoting Lynn v Lynn,216 AD2d 194, 195 [1st Dept 1995]). We have applied that doctrine only in the total absence of evidence that defendant's conduct contributed to the injury (see id. at 560-561 [no evidence that material on which the plaintiff slipped was created by the defendant rather than another construction project in the area]; J.E. v Beth Israel Hosp., 295 AD2d 281, 284 [1st Dept 2002] [the plaintiff could not produce any evidence that she was sexually assaulted while a patient at the defendant hospital], lv denied 99 NY2d 507 [2003]; McNally v Sabban, 32 AD3d 340, 342 [1st Dept 2006] [because the plaintiff could not remember fall down stairs, no evidence that any defects contributed to the fall]; Lynn, 216 AD2d at 196 [same]; Sawh v Schoen, 215 AD2d 291, 193 [1st Dept 1995] ["It is mere speculation that defendant . . . formulated an opinion regarding (the patient's) condition and contrary to the facts of record that he offered advice to his colleagues concerning her treatment. There is simply no evidence that he undertook to supervise her care"]). Here, there can be no dispute that some of the delay was attributable to defendants. Delays are cumulative, and it is possible that both sources contributed to the result. Whether [*23]they actually did so is a question for the jury. "There can be more than one proximate cause of an accident, and there is no requirement for the plaintiff to exclude every other possible cause other than [defendants'] breach of duty" (Lynn, 216 AD2d at 195-196).
Defendants simply have not established their prima facie case as to causation. Therefore, we need not even consider plaintiffs' evidence (see e.g. Bardio, 213 AD3d at 629]).
Nevertheless, plaintiffs have established an issue of fact as to proximate causation. Plaintiffs' expert Dr. Hugh McGowan — an expert in police intervention to prevent suicide — opined that, if the Hotel had called sooner, the police would have had an opportunity to prevent Beadell's suicide. To withstand summary judgment, plaintiffs are not required to identify a specific remedy that would have prevented the harm (see Brown, 31 NY3d at 520; see also Applewhite, 21 NY3d at 431 ["Although . . . plaintiffs have not specifically identified any other available avenues of protection to which the mother could have resorted, the allegations raise the question of whether the EMTs may have lulled plaintiffs into a false sense of security"] [quotation marks and citations omitted]). Even so, Dr. McGowan identified two. If the police had arrived before Beadell was on the ledge, they could — and, according to Dr. McGowan, would — have taken him into protective custody, preventing his suicide. They also could have timely notified the NYPD Hostage Negotiation Team, who "can make the difference between life and death" and "have an outstanding record" of success, "but they must be notified as soon as possible." The majority errs by making a factual declaration that, because police officers unsuccessfully "engaged with decedent and attempted to persuade him to come back into his room," other forms of engagement would not have been successful.1 [FN4] Respectfully, this issue is the province of the jury.
As plaintiffs' psychology expert, Dr. Steven Fayer, opined, most suicides are preventable and earlier intervention increases the chance of preventing suicide. He further explained that timely police intervention prevents many attempts at suicide by jumping off hotels. He concluded that defendants' unreasonable delay allowed the situation to escalate and prevented the necessary intervention.1 [FN5] Contrary to the majority's reasoning, this conclusion was based on the facts at issue. In particular, Dr. Fayer opined that the characteristics of this particular suicide — Beadell's lengthy communication with his family, consumption of alcohol, and history of prevented suicide attempts — indicate that it was preventable with earlier action. This opinion, supported by facts in the record, is sufficient to raise an issue of fact.
That these facts were not known to defendants at the time makes them neither irrelevant nor inadmissible. A plaintiff must demonstrate not only that an injury was foreseeable — although not that its precise manner or extent was [*24]foreseeable — but also "that the defendant's negligence was a substantial cause of the events which produced the injury" (Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315 [1980]). To that end, courts frequently consider evidence that the alleged negligence actually led to the asserted harm (see e.g. Frangiadakis v 51 W. 81st St. Corp., 161 AD3d 478 [1st Dept 2018]). Such evidence includes proof of a party's psychological condition prior to the alleged negligence, regardless of whether it was known to the defendant (see Matter of Tobin v Steisel, 64 NY2d 254, 258-259 [1985]; Matter of Makowski v New York State & Local Employees' Retirement Sys., 206 AD2d 657, 657-658 [3d Dept 1994]; Bartolone v Jeckovich, 103 AD2d 632 [4th Dept 1984]; Steinhauser v Hertz Corp, 421 F2d 1169, 1170-1171 [2d Cir 1970] [applying New York law]). Defendants themselves do not ask us to limit ourselves to the evidence known to them at the time. On the contrary, their statement of facts opens with a description of Beadell's mental health history. To limit the evidence so would be particularly inappropriate here. The majority rules on an argument not made by defendants, without providing any citations to support its ruling. Moreover, a jury could find that this evidence remained unknown to defendants precisely because they misleadingly assured plaintiffs that the police would be called, and that plaintiffs relied on this misrepresentation to their detriment.
Once again conflating causation and duty, the majority finds plaintiffs' experts' opinions inadequate because they do not identify standards or guidelines relevant to defendants' conduct. Yet, violation of a standard or guideline does not show that a defendant caused harm. Significantly, defendants do not even argue that it does. Perhaps they do not advance this argument because such violations are relevant only to duty, not to causation (see Valdes v Brooks, 2023 WL 309611, *2 n 3, 2023 US App LEXIS 1261, *5 n 3 [2d Cir Jan. 19, 2023, No. 21-2971-cv] [declining to address impact of federal law and regulations on standard of care, given separate resolution on grounds of causation]; Gallagher v Cayuga Med. Ctr., 151 AD3d 1349, 1352-1355[3d Dept 2017] [finding that defendants did not deviate from accepted practice and thus met the standard of care, without addressing causation]; Park v Kovachevich, 116 AD3d 182, 191-193 [1st Dept 2014] [separately addressing causation and deviation from medical standards]; Ozugowski v City of New York, 90 AD3d 875 [2d Dept 2011] [addressing standard of care only]; see also David v County of Suffolk, 1 NY3d 525, 526 [2003] [plaintiff's expert "failed to establish the foundation or the source of the standards underlying the conclusion that defendant's supervision of the infant plaintiff was inadequate"]; Diaz v New York Downtown Hosp., 99 NY2d 542, 544-545 [2002] [violation of non-binding guidelines did not establish ftlinedeviation from standard of care]; Amatulli v Delhi Constr. Corp, 77 [*25]NY2d 525, 533 & n 2 [1991] [finding no evidence that facts giving rise to duty were generally known within the industry]; Verderese v 3225 Realty Corp., 147 AD3d 637, 638 [1st Dept 2017] [lack of standard requiring handrails showed they were not required]; Hotaling v City of New York, 55 AD3d 396, 398 [1st Dept 2008] [absence of New York City Building Code or industry standard violation was insufficient to show that design was negligent], affd 12 NY3d 862 [2009]; Timmins v Tishman Constr. Corp., 9 AD3d 62, 69-70 [1st Dept 2004] [separately addressing causation and conformity to industry standards], lv dismissed 4 NY3d 739 [2004], rearg denied 4 NY3d 795 [2005]).1 [FN6] At most, the majority raises an issue that goes to the weight a factfinder may give to expert testimony.
In finding inadequate proof of causation, the majority emphasizes that Beadell already had access to the window ledge. Nobody disputes that Beadell subsequently came in from the ledge, however, and the record does not show when he returned to it.1 [FN7] The majority's assumption that he either could or would have stepped onto the ledge before police arrived is, at best, an improper inference in favor of movants (see e.g. Prendergast v New York City Tr. Auth., 220 AD3d at 583, 584 [1st Dept 2023]). Again, the majority squarely places the burden on plaintiffs and resolves issues of facts on a motion for summary judgment.
Essentially, the majority disagrees with plaintiffs' experts that earlier intervention could have changed the outcome. Yet, under the majority's reasoning, a claim for failing to intervene could never make it to trial. That is not the law (see Brown, 31 NY3d at 519-520 [denying summary judgment based on absence of hypothetical improvements to intersection]; Turturro, 28 NY3d at 484-485 [upholding jury verdict despite argument that proposed measures would not have prevented accident]).
Nor does the case law cited by the majority support its position. The suicide cases on which the majority relies all address medical providers' liability for suicide that occurred days after their last contact with the decedent (see Valdes, 2023 WL 309611, *1, 2023 US App LEXIS 1261, *2-3 [the decedent died at least two days after session with the defendant doctor]; Morillo v New York City Health & Hosps. Corp., 166 AD3d 525, 525 [1st Dept 2018] [the decedent shot and killed himself two days after being discharged from the defendant hospital's emergency department]; Park, 116 AD3d at 185-187 [the decedent was found dead 11 days after discharge from the defendant clinic and 3 days after speaking to the defendant doctor]; Nieves v City of New York, 91 AD2d 938, 939 [1st Dept 1983] ["(D)ecedent committed suicide . . . one month after his discharge"]).1 [FN8] Again, defendants' employees were not medical staff, and plaintiffs' cause of action does not sound in medical malpractice. Plaintiffs do not argue that defendants could have, but failed to, prevent Beadell from ever killing himself. Rather, they [*26]assert that family members could have immediately called the NYPD to take all reasonable steps to prevent the tragedy. Plaintiffs maintain that, based on defendants' assurances, they did not do so. Failing to permanently cure a decedent's condition is entirely different to isolating him from assistance during an emergency.
The majority's reliance on Poree v New York City Hous. Auth. (139 AD3d 528 [1st Dept 2016]) and Alloway v 715 Riverside Dr. (298 AD2d 148 [1st Dept 2002]) is even further afield. Both cases address liability for a faulty smoke detector when plaintiff indisputably had the opportunity to escape a fire. Setting aside the significant factual differences, the very dispute before us is whether defendants deprived the NYPD of the opportunity to prevent harm. Whatever principles these cases demonstrate are simply inapplicable to the appeal before us.
Plaintiffs' evidence was more than sufficient to meet their burden (see Dunham, 303 NY at 504 ["The defendants urge that the doctor's testimony was not sufficiently definite. . . . We are satisfied, however, that the main point of his testimony was to the effect that the delay . . . did contribute to this man's death"]; Hernandez, 129 AD3d at 532 ["Although plaintiffs' expert did not quantify the extent to which defendant's negligence decreased the chance . . . his competing opinion that the delay in treatment diminished plaintiff's chance of a better outcome was sufficient"] [emphasis added]). Indeed, it is hard to imagine what more favorable evidence a plaintiff could present. Against this evidence is weighed nothing. Defendants have not rebutted plaintiffs' affidavits with the opinion of any expert in suicide prevention. Their theory of causation rests entirely on speculation. Yet, inexplicably, the majority grants summary judgment based solely on conjecture.
Conclusion
 In sum, by reassuring plaintiffs that they would act and thus that plaintiffs did not need to, defendants cut off Beadell from the aid that his family would have provided. It was foreseeable that faulty efforts to prevent suicide would result in suicide. And the Hotel's delay was the difference between life and death. At least, so reasonable jurors 
 could find. That the majority disagrees does not warrant summary 
 judgment. Defendants' motion should be denied and the case should 
 proceed to trial.
 
Order, Supreme Court, New York County (John J. Kelley, J.), entered July 12, 2022, reversed, on the law, without costs, the motion granted, and the complaint dismissed. The Clerk is directed to enter judgement accordingly. Order, same court and Justice, entered June 9, 2023, which, insofar as appealed from as limited by the briefs, denied plaintiffs' motion for discovery sanctions insofar as it declined to strike defendants' answer, dismissed, without costs, as moot.
Opinion by Pitt-Burke J. All concur except Singh J.P. who dissents in an Opinion.
Singh, J.P., Scarpulla, Pitt-Burke, Higgitt, O'Neill Levy, JJ.
THIS CONSTITUTES [*27]THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: May 7, 2024

Footnotes

Footnote 1: 1 Plaintiff indicated that she asked decedent if he had been drinking not due to an indicia of intoxication, but based on her prior experience with decedent becoming more emotional and happier when drinking. 

Footnote 2: 2 In fact, plaintiff noted that decedent never threatened to kill himself over the phone.

Footnote 3: 3 According to the record on appeal, decedent's sister was unsure if she received a text message at 6:29 p.m. or 6:39 p.m. However, phone records indicate that she called plaintiff (decedent's mother) after receiving these messages, at 6:27 p.m.

Footnote 4: 4 The plaintiffs commenced a second action, naming TRYP, HCS Hospitality, Inc. and Ronica Sharma as defendants. The two actions were then consolidated and plaintiff subsequently discontinued the action against HCS and Ronica Sharma.

Footnote 5: 5 Both the majority and the dissent agree that the facts of this case involve tragic circumstances. However, as an intermediate appellate court, we are not advocates for a cause but rather arbiters of the law. We are charged with making determinations based on the facts presented and known to the parties and must separate the emotionally charged nature of this case from our duty as jurists. In doing so, we must refrain from embellishing the record and using inflammatory rhetoric to support our position. These techniques, while not only improper, do not change the facts relevant to the disposition of this case—that the police were called, that defendant was alive when the police arrived, and that this State's well-established precedent on duty is what controls.
Footnote 6: 6 As per the record on appeal, decedent was taking medication for anxiety and depression.

Footnote 7: 7 Even if we were to assume defendants assumed a duty of care to decedent when they agreed to go check on him, this duty was to be performed with due care (Parvi v City of Kingston, 41 NY2d 553, 559 [1977]), and as "an ordinary [person] would do in performing the task" (Zelenko v Gimbel Bros., 158 Misc 904, 904 [Sup Ct, NY County 1935], affd 247 AD 867 [1st Dept 1936]). Thus, plaintiffs have failed to show that defendants' conduct was unreasonable under the circumstances (see Gordon, 70 NY2d at 841), or that the duty assumed at this instance extended beyond checking on decedent and providing an update to decedent's sister as to defendants' assessment of decedent's condition based on the facts known to them at the time.

Footnote 8: 8 The dissent's reliance on Applewhite (21 NY3d 420, 431 [2013]) is misplaced, as this record is devoid of any evidence that defendants are a government agency, that it assumed a special duty as that government agency, that it took control of an emergency situation or offered advice as to the best course of action. Those cases in which a government entity assumed a special duty are particularly unavailing because the policy considerations behind the special relationship exception, while different, would likely compel denial of recovery here (see Koyko v City of New York, 189 AD3d 811, 813 [2d Dept 2020]). Under the elements of the special relationship exception, plaintiffs would not be able to show the element of reliance, as is required by Cuffy v City of New York (69 NY2d 255 [1987]). As relevant here, it is undisputed that decedent did not rely on any promise of the hotel to call the police and decedent's sister was the person who requested the call be made. However, it is unclear whether her reliance on the conversation with hotel staff could be transferred to the decedent's benefit (see Kircher v City of Jamestown, 74 NY2d 251, 258 [1989]; Cuffy, 69 NY2d at 261-262 [rejecting a claim of special relationship where a father sought police protection for his wife and the children who lived with him but claim was made on behalf of an adult child who was not a member of his household]).
Footnote 9: 9 According to plaintiffs, the information concerning a photograph being taken of decedent's feet on a ledge looking down was withheld from the hotel during the first call made, a call which plaintiff asserts began the hotel's duty. However, this information cannot be used as both a shield and a sword, as plaintiffs' expert now contends that the fact decedent was on the ledge after the alleged delay in calling the police signifies the progression of the suicidal ideations.

Footnote 10: 10 Greeniger testified that her legal name is Kayla Beadell, but that she went by both Greeniger and Beadell during her husband's life. To distinguish her from her Noah Beadell, I will refer to her as Greeniger.

Footnote 1: 11 The times of all Anderson's phone calls, confirmed by her cell phone records, are given in New York time rather than Minnesota time.

Footnote 2: 12 There is some dispute about when Kelsey and Ramon saw the liquor bottles and pill containers. Leslie also testified that only on the fifth call did Anderson state that Beadell was suicidal (and, tellingly, that she would have taken more action had she known Beadell was suicidal). It is undisputed that Anderson had previous calls with Kelsey, however. Kelsey was not available to be deposed, although her account at the time was recorded in the incident report form. Ramon testified that he knew Beadell was suicidal before visiting the room but denied noticing anything unusual when he did. To the extent that this testimony contradicts plaintiffs' account, we must resolve the dispute in favor of the non-moving parties, i.e., plaintiffs. That in itself would warrant denial of summary judgment (see e.g. PF2 Sec. Evaluation, 211 AD3d at 515-516).

Footnote 3: 13 Plaintiffs rely on Bonafini v G6 Hospitality Prop., LLC (101 Mass App Ct 612 [2022], review denied 491 Mass 1101 [2022]) and Sneider v Hyatt Corp. (390 F Supp 976 [ND Ga 1975]). Neither of these cases address explicit promises by hotel staff to call 911 (see Bonafini, 101 Mass App Ct at 613; Sneider, 390 F Supp at 978, 980). Additionally, hotel staff in Bonafini had no reason the believe the decedent was suicidal (101 Mass App Ct at 615), and there was a factual dispute over knowledge of any such reason in Sneider (390 F Supp at 980 & n 2).

Footnote 4: 14 The majority argues that plaintiffs initially withheld evidence Beadell was already on the ledge before they called the Hotel. This is inconsistent with Anderson's account of the conversation, in which she describes alerting Hotel staff that Beadell was on the ledge. Given the exigencies of the situation, a jury could find that it was not incumbent on plaintiffs to provide all the underlying reasons they feared that Beadell was at risk. Hotel staff did not ask for those. Neither does such evidence negate plaintiffs' theory of progression. The first time Beadell went onto the ledge, either sua sponteor in response to visitors, he returned to his room. The second time, he jumped.

Footnote 5: 15 Although Dr. Fayer and Dr. McGowan measured delay from Anderson's first call, both were clear that the 25-minute delay from the call at 7:12 p.m. was still significant. As Dr. Fayer put it, "every minute counts."

Footnote 6: 16 Veccia v Clearmeadow Pistol Club (300 AD2d 472 [2d Dept 2002]) could be read as inferring lack of causation from no violation of industry standards, or as finding lack of causation and no violation of industry standards. The case law cited supports the latter interpretation (see Cicero v Selden Assoc., 295 AD2d 391, 392 [2d Dept 2002] [finding defect not actionable]; Speirs v Dick's Clothing & Sporting Goods, 268 AD2d 581 [2d Dept 2000] [finding affidavit insufficient when it did not set forth safety guidelines violated]). In any case, the briefs indicate that plaintiff in Veccia fell down stairs and could not explain why (2002 WL 32723128, *11; 2002 WL 32723126, *16). Thus, at most, Veccia stands for the proposition that expert testimony would not change the outcome of a case like McNally (32 AD3d 340 [1st Dept 2006]) or Lynn (216 AD2d 194 [1st Dept 1995]).

Footnote 7: 17 The Hotel's incident report states that, after Kelsey and Ramon inspected the room, Anderson told Hotel staff that Beadell was sending pictures with his legs dangling over the ledge. Since this took place "around 6:30 or 7 [p.m.]," we can — and, therefore, must — infer that Kelsey mixed up the order of these events. Moreover, no such photographs are in the record, and Anderson denies receiving or speaking of any after the initial call. On this appeal, we must treat her denial as credible (see e.g. Mutual Benefits Offshore Fund, Ltd. v Zeltser, 172 AD3d 648,650-651 [1st Dept 2019], lv dismissed 35 NY3d 933 [2020]).

Footnote 8: 18 Gallagher did involve a suicide only "[a] short time after" discharge but, as previously stated, addressed only duty and not causation (151 AD3d at 1350). Furthermore, in two of these cases, the plaintiff's expert evinced doubt that the discharge caused the decedent's suicide (see Valdes,2023 WL 309611, *3, 2023 US App LEXIS 1261, *5-6; Nieves, 91 AD2d at 939). Plaintiffs' experts in this case showed no such equivocation.