[777 NYS2d 458]

John Timmins et al., Respondents, v Tishman Construction Corp. et al., Doing Business as Tishman Harris White-hall, et al., Appellants, et al., Defendant.

First Department, May 27, 2004

## APPEARANCES OF COUNSEL

*Weidenbaum & Harari, LLP,* New York City (*Allan H. Carlin* of counsel), for appellants.

*Tabak, Mellusi & Shisha,* New York City (*Jacob Shisha* and *Stephen B. Roberts* of counsel), for respondents.

## OPINION OF THE COURT

SULLIVAN, J.

This appeal presents the issue of whether a contractor has a duty of care arising out of its contractual obligations so as to impose liability to an injured noncontracting party.

Plaintiff, employed by the New York City Department of Transportation (DOT) as a deckhand assisting passengers entering and exiting the ferry at the Whitehall Ferry Terminal, owned by the City of New York and operated by DOT, sues for personal injuries allegedly sustained while he was pushing open a rolling gate. His wife also seeks damages for her alleged loss of consortium. At the time of the accident, the Terminal, which has an upper and lower level and three slips for docking, was undergoing a substantial renovation.

Defendants Tishman Construction Corp. and Frederick R. Harris, Inc., both doing business as Tishman Harris Whitehall (Tishman/Harris), constituted a joint venture that was the construction manager for the renovation project under a contract with the New York City Economic Development Corporation (EDC). Pursuant to a separate contract with the EDC, defendant Seasons Contracting Corp. was the general contractor for the demolition work.

Since the rebuilding of the Terminal was an extensive and long-term project involving distinct phases of demolition and construction, the work was arranged to avoid any interruption of ferry service between Manhattan and Staten Island. As the contract between Tishman/Harris and the EDC specifically acknowledged: "The provision of uninterrupted 24-hour-a-day ferry service for the 60,000 daily passengers to and from two of the three existing ferry slips is a critical requirement during construction of the Project. A construction phasing plan that

satisfies this requirement and provides continuity of all major operational and passenger services throughout the construction period will be implemented."

In July 2000, as part of the phased construction activities arranged to accommodate the demolition of slip No. 3, changes had to be implemented in the flow of passengers to and from the ferries. This included the installation in the summer of 2000 of eight-feet-high rolling chain-link gates to enclose the walkway between slip No. 2 and the passenger waiting room on the upper level of the ferry terminal. Tishman/Harris subcontracted the installation of these gates to defendant Seasons, which, in turn, subcontracted the job to defendant Regional Scaffolding & Hoisting Co., Inc. Regional then subcontracted the fabrication and installation of the gates to defendant Bayside Fencing, Inc.

According to Bayside's vice-president, this type of gate, known as a cantilever gate, standard at a construction site, hung from an overhead roller track and was designed to slide open and closed between vertical posts. In order for the gate to be balanced so that it would slide without dragging on the ground, the distance between the vertical posts should be approximately one foot less than one half of the width that the gate is designed to enclose. If, for instance, a cantilever gate is designed to cordon off an area 20 feet wide, the distance between the vertical posts should be approximately nine feet. Shortly after the installation of the gate involved herein, DOT informed Tishman/Harris that it needed to be modified so as to provide a wider opening for passenger traffic. Thereafter, one of the vertical posts was moved four to five feet to widen the opening. A few days after the modification was made, DOT informed Tishman/Harris that the end of the gate was dragging on the ground for a few feet before reaching its fully closed position, a condition that was apparently the result of the relocation of the vertical post, which caused the gate to become unbalanced. The problem was promptly rectified by the addition of footage to the tail end of the gate, which balanced its front end when the gate was in a fully closed position, and a six-inch standard rubber wheel at the front end of the gate. Tishman/Harris and Seasons inspected the gate after the modification, finding it be in good working order, and approved payment to Regional.

Plaintiff claims that he was injured while moving the gate on November 3, 2000. At his deposition, he testified that he was unable to move the gate because it "was broken, dragging on

the ground," adding, "There was no wheel at the bottom of the gate where there was supposed to be a wheel." He testified further that there had been a wheel on the gate when it was installed but that it had been subsequently replaced when it had broken off. Plaintiff claimed there had been no wheel on the gate for approximately two weeks before the accident.

It is uncontroverted that ferry service was provided on an uninterrupted basis from slip No. 2 from the summer of 2000 through the date of the accident and that DOT was in operational control of the upper level of the Terminal, where the gate was located, during this period of time. It is also undisputed that the daily activity reports at the job site, as produced during discovery, confirm that no ongoing demolition or construction work was conducted on the upper level of the Terminal between the installation of the gate during the summer of 2000 and the date of the accident. The Ferry Terminal project contracts of Tishman/Harris and Seasons with EDC do not contain any provision obligating either Tishman/Harris or Seasons to maintain the upper level of the Terminal or to inspect it for any defective conditions during the period between the time of the installation and modification of the gate and the date of the accident.

After joinder of issue and discovery, Tishman/Harris, Seasons and Regional, collectively the Tishman defendants, moved for summary judgment dismissing the complaint, arguing that they did not have control of the Ferry Terminal during the relevant time period and that none of them had any contractual obligation to inspect or maintain the premises where plaintiff was injured. Thus, as argued, they did not owe a duty of care to plaintiff. Supreme Court denied the motion, holding that a triable issue of fact existed as to whether any of the defendants had continuing access to the area or a continuing obligation to maintain the gate. The court also found a factual issue as to whether the gate was improperly designed or installed in the first instance. In our view, whether defendants had continued access to the area is irrelevant to the issue presented, i.e., whether defendants owed a duty to plaintiff to maintain the gate. Since none of the reasons propounded to deny the motion withstand scrutiny, we reverse and grant summary judgment.

The threshold issue is the extent, if any, of the duty of care that the Tishman defendants, as contractors, owed to plaintiff, a noncontracting party to their contractual arrangements with EDC and each other. In a recent decision (*Church v Callanan Indus.*, 99 NY2d 104 [2002]), the Court of Appeals again had oc-

casion to set forth the general rule that a contractor does not owe a duty of care to a noncontracting third party. A duty of care to noncontracting third parties, however, may arise out of a contractual obligation or the performance thereof in three sets of excepted circumstances, in which case the promisor is subject to tort liability for failing to exercise due care in the execution of the contract (*id.*; *see also Espinal v Melville Snow Contrs.*, 98 NY2d 136, 139-141 [2002]; *H.R. Moch Co. v Rensselaer Water Co.*, 247 NY 160 [1928]; *Eaves Brooks Costume Co. v Y.B.H. Realty Corp.*, 76 NY2d 220 [1990]; and *Palka v Servicemaster Mgt. Servs. Corp.*, 83 NY2d 579 [1994]). Citing *Espinal*, the court in *Church* identified those circumstances as: first, "where the promisor, while engaged affirmatively in discharging a contractual obligation, creates an unreasonable risk of harm to others, or increases that risk" (99 NY2d at 111); second, "where the plaintiff has suffered injury as a result of reasonable reliance upon the defendant's continuing performance of a contractual obligation" (*id.*), and third, " 'where the contracting party has entirely displaced the other party's duty to maintain the premises safely' " (*id.* at 112, quoting *Espinal*, 98 NY2d at 140). In the latter instance, unlike the first exception, "the promisor . . . may indeed be liable for failing to make conditions safer for the injured party" (*Church*, 99 NY2d at 112).

In *Espinal*, the injured plaintiff, who slipped on an icy condition on her employer's parking lot, sued a company under contract to her employer to plow and remove snow from the premises. The plaintiff there relied almost entirely on the third exception. The Court of Appeals refused to impose tort liability on the contractor, finding that its contractual undertaking was not the type of "comprehensive and exclusive" property maintenance obligation that entirely displaced the landowner's duty to maintain the premises safely, since the employer "at all times retained its landowner's duty to inspect and safely maintain the premises" (*Espinal*, 98 NY2d at 141).

In *Church*, a plaintiff, injured when the vehicle in which he was a passenger veered off a highway and careened down an embankment, sued the subcontractor which had failed to complete performance of its contract for the installation of a guiderail along the section of the roadway where the car plunged off the road. In rejecting the claim, the court held that the plaintiff failed to qualify under any of the exceptions to the general rule (99 NY2d at 112), finding that the subcontractor's fail-

ure to install the additional length of guiderail, as required under its contract, did not make the highway less safe than before the construction project began, that the driver of the car in which the plaintiff was a passenger could not have detrimentally relied on the subcontractor's continued performance of its contractual duties and that the subcontractor did not comprehensively contract to assume the owner's (New York State Thruway Authority) safety-related obligations with respect to the guiderail system (*id.* at 112-113).

Here, instead of analyzing the Tishman defendants' potential liability in terms of the three exceptions to the general rule that a contractor does not owe a duty of care imposed by law to a noncontracting third party, Supreme Court distinguished *Church* on the grounds that the alleged negligence there related to work which "had been completed long before the accident in question" and that the subcontractor "had completely vacated the construction site many months or years before the incident." This misapprehension of the holding in *Church* was the basis of the motion court's conclusion that triable issues exist with respect to "whether the area of the Ferry Terminal where the gate was installed should be considered a separate, isolated construction site, rather than part of the larger Ferry Terminal construction site, and whether defendants, or any of them, had continuing access to the area and/or a continuing obligation to maintain the condition of the gate." None of these issues is relevant to a consideration of the applicability of any of the exceptions to the rule that a duty of care to noncontracting third parties does not arise out of a contractual obligation or the performance thereof.

There is no claim that the second exception—detrimental reliance—applies to this accident. It is also uncontroverted that the Tishman defendants did not entirely displace the obligations of the City of New York, as landowner, to inspect and maintain the area where the gate was located. Indeed, there is no gainsaying the fact that DOT, in providing ferry service to tens of thousands of passengers on a daily basis at all times relevant to this action, maintained operational control and management over the upper level of the Terminal where the gate was located.

Plaintiff is unable to cite any provision in the relevant contracts that imposes any obligation approaching a "comprehensive and exclusive" duty of inspection and maintenance, as required under prevailing precedent, to hold the Tishman defendants liable in tort. The only provision plaintiff can point

to that arguably relates to a duty of maintenance appears in the agreement between Seasons and the EDC, which provides, "When [Seasons] is on the site, [it] shall provide and maintain barriers, fences, warning signs and lights satisfactory to EDC." This contractual undertaking, by its own terms, contemplates continuing inspections of the premises by EDC and requires Seasons to perform services only to the extent deemed satisfactory by EDC. As with the contractor in *Espinal*, which contractually undertook to provide snow removal services under specific circumstances and to apply salt/sand at the request of the landowner, which at all time retained its duty to inspect and safely maintain the premises (98 NY2d at 141), Seasons had limited duties under the express terms of its contract and did not "entirely absorb [the City of New York's] duty as a landowner to maintain the premises safely" (*id.*)

Moreover, in this regard, quite apart from the fact that no ongoing demolition or construction activities were taking place on the second level between the date of the installation of the gate and plaintiff's accident, there is no showing that Seasons, during the weeks prior to plaintiff's accident, was on the site for more than two days, when isolated work was performed in places physically removed from the area where the gate was located. Needless to say, Seasons' compliance with its limited contractual obligations in no way comports with a "comprehensive and exclusive" (*Palka*, 83 NY2d at 588) contract requiring inspection, repair and maintenance of the premises, such that it displaces the City's duty as a landowner to maintain the premises safely.

Plaintiff's preoccupation with whether the Tishman defendants had notice that the gate was not operating properly in the weeks immediately preceding the accident is, of course, misplaced and entirely irrelevant, given the absence, as a matter of law, of any duty owed by these defendants to plaintiff with regard to inspection and maintenance of the gate. In view of the limited scope of the Tishman defendants' contractual duties with regard to the maintenance of fences, coupled with DOT's uncontroverted management and operational control over the area where the gate was located at the times relevant to the accident, there is no basis for concluding that these defendants assumed the responsibility of maintaining the premises safely to the extent of entirely displacing EDC's responsibility.

In such circumstances, there is no basis for imposing tort liability on the Tishman defendants unless, as recognized by the

first *Espinal* exception, they negligently created or exacerbated the dangerous condition that caused plaintiff's injury. On this point, Supreme Court found that there were questions of fact as to whether the gate was improperly designed or installed.

Plaintiff's claim that the Tishman defendants negligently created or exacerbated a dangerous condition is based entirely upon the affidavit of his expert, Edward Brunjes, whose opinions, lacking an adequate foundation or evidentiary basis, are legally insufficient to create an issue of fact. An architect with approximately 40 years of experience and a degree in civil engineering as well, he described the extent of his expertise with regard to the issues in this case as "vast experience in the construction field and . . . familiar[ity] with all aspects of construction projects including numerous projects involving the City of New York. A copy of [my] resume is attached hereto." Nothing else is said. Significantly, the expert did not claim any specific expertise or experience with regard to the engineering, procurement, installation, maintenance or repair of gates of any kind, much less a cantilever gate such as is involved herein.

It is undisputed that the gate was modified shortly after its installation to widen the opening and, as a result, failed to operate properly, one of its ends dragging on the ground for a few feet as it slid open and closed. It is also undisputed that the defect was promptly corrected by the addition of a counterbalancing "tail" at one end of the gate and a wheel at the other end. The issue here is whether the gate, as so modified, created or exacerbated a dangerous condition. Whether the gate should have been an overhead gate, as claimed by plaintiff's expert, or a cantilever, as installed by the Tishman defendants, is irrelevant to the issues presented. There is no claim, or even a suggestion, that a cantilever gate is inherently dangerous, except for the expert's conclusory assertion that the gate was not suited for its intended purpose, which is nothing more than his ipse dixit.

Significantly, plaintiff's expert did not offer an opinion that the modification of the gate by the addition of a tail and a wheel did not conform to accepted industry standards, or that the gate, as so modified, was not in good working order. On the contrary, he acknowledged that the addition of the wheel was appropriate to support the weight of the gate. He opined, however, that the wheel used to repair the fence prior to plaintiff's accident was "too small." The record is bare of any evidentiary basis for this assertion. Moreover, he made no reference to ei-

ther the dimensions of the wheel that allegedly became detached from the gate or to the wheel that would have satisfied the standards of good industry practice. Notably, he even failed to express an opinion as to whether the wheel added to the gate at the time of its modification conformed to industry standards.

Compounding the inherent deficiencies of such conjecture, the expert then guessed as to the cause of the wheel's detachment from the gate, stating, "Apparently, the repairs were not done properly." Without disclosing any evidentiary basis therefor, the expert further speculated that his investigation, unspecified, it should be noted, "indicates" that the gate had the same type of wheel on it when examined after the accident as it had before the accident. Such opinions, based on speculation, conjecture and without an evidentiary basis, are patently inadequate to create an issue of fact (*Lynn G. v Hugo*, 96 NY2d 306 [2001]). Expert opinions such as those expressed by plaintiff's expert have been routinely rejected as speculative and as having no probative value (*see e.g. Gonzalez v 98 Mag Leasing Corp.*, 95 NY2d 124 [2000]; *Romano v Stanley*, 90 NY2d 444, 451-452 [1997]).

We have examined plaintiff's other contentions and find that they are without merit.

Accordingly, the order of the Supreme Court, New York County (Paula J. Omansky, J.), entered June 24, 2003, denying the motion of defendants Tishman Construction Corp. and Frederick R. Harris Inc., both doing business as Tishman Harris Whitehall, Seasons Contracting Corp. and Regional Scaffolding & Hoisting Co., Inc. for summary judgment dismissing the complaint, should be reversed, on the law, without costs or disbursements, and the motion granted. The Clerk is directed to enter judgment accordingly.

BUCKLEY, P.J., WILLIAMS and GONZALEZ, JJ., concur.

Order, Supreme Court, New York County, entered June 24, 2003, reversed, on the law, without costs or disbursements, and defendants-appellants' motion for summary judgment dismissing the complaint granted. The Clerk is directed to enter judgment accordingly.