Donaldson v Port Auth. of N.Y. & N.J. (2025 NY Slip Op 02719)

Donaldson v Port Auth. of N.Y. & N.J.

2025 NY Slip Op 02719

Decided on May 06, 2025

Appellate Division, First Department

PITT-BURKE, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: May 06, 2025
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Cynthia S. Kern
Ellen Gesmer Bahaati E. Pitt-Burke Kelly O'Neill Levy

Index No. 153624/18|Appeal No. 3320, 3320A, 3320B|Case No. 2023-05910, 2023-05914 , 2024-00695|

[*1]Marybeth Donaldson, etc., Plaintiff-Appellant,
v
The Port Authority of New York and New Jersey, Defendant-Respondent.

Plaintiff appeals from an order of the Supreme Court, New York County (Arlene P. Bluth, J.), entered on or about July 7, 2023, which granted defendant's motion for summary judgment dismissing the complaint. Plaintiff also appeals from an order, same court and Justice, entered on or about July 7, 2023, which denied plaintiff's motion to vacate the note of issue and an order, same court and Justice, entered on or about November 3, 2023, which, to the extent appealed from, denied plaintiff's motion for leave to renew opposition to defendant's motion for summary judgment.

Costigan Law PLLC, New York (William F. Costigan of counsel), for appellant.
The Port Authority of New York and New Jersey Law Department, New York (Cheryl N. Alterman of counsel), for respondent.

PITT-BURKE, J. 

 In this action to recover damages for wrongful death, plaintiff seeks to hold defendant the Port Authority of New York and New Jersey liable for the death of the decedent, who died by suicide after jumping off the George Washington Bridge (GWB). To fully capture the nature of this appeal, however, it is pertinent to first discuss that the issue here is not whether the Port Authority's alleged negligence arose out of the performance of a governmental rather than a proprietary function; this Court has already determined that the Port Authority, as owner of the GWB, was acting in a proprietary capacity at the time this claim arose and therefore that the ordinary rules of negligence apply. In the appeal now presented to us, the Port Authority's expert engineer opines that the engineering concerns associated with modifying the 100-year-old bridge justified the steps taken and the interim measures implemented, but also opines that reasonable engineering judgment delayed the implementation of the safety mechanism that plaintiff contends would have ultimately prevented the decedent's death by suicide. We therefore consider whether, given the record presented, the Port Authority has established its prima facie burden under ordinary rules of negligence. For the reasons that follow, we find that the Port Authority established that the pedestrian walkways on the bridge were safe for the public at large, and the steps taken, including additional interim measures implemented prior to this incident to help individuals who, like the decedent, were suffering from suicidal ideations, were reasonable in light of the complexity and size of the bridge.
Factual and Procedural Background
On the morning of July 27, 2017, at approximately 6:35 a.m., Andrew Donaldson walked along the south walkway of the upper level of the GWB, climbed over the four-foot railing, and jumped to his death. In April 2018, plaintiff Marybeth Donaldson, individually and as Administrator of the Estate of Andrew Donaldson, and as parent and natural guardian of A.D. and C.D., commenced an action against the Port Authority.
Previously, this Court reversed Supreme Court's order granting defendant's motion to dismiss[*2], finding that the complaint alleged "sufficient facts which, if true, show that defendant, as owner of the GWB, was acting in a proprietary capacity in the design and maintenance of the bridge, and therefore was subject to suit under the ordinary rules of negligence applicable to nongovernmental parties" (Feldman v Port Auth. of N.Y. & N.J., 194 AD3d 137, 140 [1st Dept 2021], lv denied 2021 NY Slip Op 67821[U] [1st Dept 2021]). Upon reinstatement of the complaint, discovery continued, and plaintiff filed her note of issue. The Port Authority then served its expert disclosure pursuant to CPLR 3101(d) and subsequently moved for summary judgment dismissing the complaint.
In support of its motion, the Port Authority submitted, among other things, an affidavit from its expert, Kevin V. Gorman, a professional engineer and former police officer, who opined, in sum and substance, that the GWB was safe for its intended purpose, that the Port Authority's planning, design, testing, development, and ultimate implementation of temporary fencing on the GWB was reasonable, and that the Port Authority fulfilled its duty to provide for the reasonably safe passage of all bridge users across the bridge. The Port Authority also submitted the affidavit of Lieutenant John Duffy, a member of the Port Authority's Public Safety Department assigned to the GWB, who described the layout of the north and south walkways on the GWB; the operation of the south walkway both on and prior to the date of the incident in question; the Public Safety Department's patrol of the south walkway; and the suicide-prevention measures that defendant implemented along both walkways.
In response to the Port Authority's motion, and with knowledge of this Court's prior determination as to the standard under which this case would be reviewed, plaintiff submitted minimal opposition, forgoing the opportunity to present rebuttal experts. Instead, plaintiff submitted news articles and Port Authority reports in support of its contention that defendant owed plaintiff's decedent a duty and was not entitled to governmental immunity. Plaintiff further asserted that the Port Authority failed to meet its burden on summary judgment and that its motion merely reprised legal arguments already determined by this Court.
In the first order appealed from, Supreme Court granted the Port Authority's motion for summary judgment dismissing the complaint. The court found that this Court's decision on the prior appeal "directed that the ordinary rules of negligence apply in this case" and therefore, it had to evaluate the Port Authority's motion "under those principles" (Donaldson v Port Auth. of N.Y. & N.J., 2023 WL 4363462, *2, 2023 NY Misc LEXIS 23416, *5 [Sup Ct, NY County, July 5, 2023, index No. 153624/18]). The court further held that defendant established its prima facie entitlement to summary judgment based on the affidavits of Mr. Gorman and Lieutenant Duffy "detail[ing] the efforts that the Port Authority [*3]undertook to consider and then implement higher fencing," which "required substantial testing to account for wind loading," and "the work of its police department to prevent suicides" (id., 2023 WL4363462, *3, 2023 NY Misc LEXIS 23416, *8). However, it found plaintiff failed to raise an issue of fact in opposition to the Port Authority's motion because "she did not submit her own expert affidavit to rebut any of Mr. Gorman's claims or to dispute the assertions of Lieutenant Duffy" (id., 2023 WL4363462, *3, 2023 NY Misc LEXIS 23416, *8-9). The court also held that "[p]laintiff's reliance upon news articles [did] not raise a material issue of fact" and since plaintiff failed to submit "anything to contradict defendant's position that it took reasonable steps to prevent suicides, [she] did not sufficiently rebut defendant's claims in the moving papers" (id.). Plaintiff appeals and we now affirm Supreme Court's decision.
Discussion
Plaintiff's argument on appeal can be narrowed down to two contentions. First, plaintiff contends that the Port Authority failed to argue it met its duty to plaintiff's decedent, and therefore it was unfair for Supreme Court to search the record to find an unargued basis for awarding summary judgment in defendant's favor. Second, plaintiff contends that the Port Authority failed to establish its prima facie burden because it did not begin to take reasonable steps to prevent deaths by suicide at the GWB until after plaintiff's decedent's death, despite knowing that other deaths by suicide occurred at the GWB before this tragic incident.
The Port Authority, however, contends that it rightfully argued under both the governmental immunity and ordinary negligence standards because plaintiff's allegations involve police protection. It further asserts that Supreme Court correctly found that its expert affidavits established its prima facie burden under the ordinary principles of negligence.
Our dissenting colleague agrees that the threshold issue of whether the Port Authority was performing a governmental function or a proprietary function has been resolved by this Court (see Feldman, 194 AD3d at 140), and that this appeal concerns the Port Authority's proprietary function in maintaining the pedestrian walkways on the GWB. However, the dissent concludes that the Port Authority's motion was made solely under a theory of governmental immunity and therefore Supreme Court erred in granting the Port Authority's motion based on a theory it did not raise.
We disagree, and find no error with Supreme Court reviewing the Port Authority's motion under the principles of ordinary negligence, as we do not find that the Port Authority's motion was made solely under a theory of governmental immunity or deem its arguments under the principles of ordinary negligence unpreserved.
Even if we were to accept that the Port Authority's motion continues its argument that it was acting in a governmental capacity and was therefore entitled to [*4]governmental immunity, its submissions in support of summary judgment also assert that it fulfilled its duty by providing for the reasonably safe passage of all bridge users "through the compliance with applicable standards, utilizing reasonable engineering judgment through the design and construction of the subject rehabilitation project and through reasonable policing methods by the Port Authority Police Department [PAPD]." The Port Authority further asserts that the "PAPD's efforts in reducing the number of suicides from the GWB is not only reasonable, but reasonably effective." We find that these assertions, which are supported by expert affidavits and contained within the Port Authority's affirmation in support of its motion, sound in the principles of ordinary negligence.
Contrary to the dissent's assertion, this Court has held that "a party may raise even a completely unpleaded issue on summary judgment so long as the other party is not taken by surprise and does not suffer prejudice" (Valenti v Camins, 95 AD3d 519, 522 [1st Dept 2012]). Therefore, that much of defendant's submissions continue with the argument that it was acting in a governmental capacity and was entitled to governmental immunity, does not thwart a finding that defendant met its initial burden under the principles of ordinary negligence.
There is also no basis to find that plaintiff was disadvantaged by Supreme Court reaching an issue that was not the primary argument relied on by the Port Authority in its motion (see Chateau D'If Corp. v City of New York, 219 AD2d 205, 209-210 [1st Dept 1996], lv denied 88 NY2d 811 [1996] ["a motion for summary judgment, irrespective of by whom it is made, empowers a court, even on appeal, to search the record and award judgment where appropriate"], citing Grimaldi v Pagan, 135 AD2d 496, 496-497 [1st Dept 1987]; CPLR 3212 [b]). Here, there was no surprise or prejudice to plaintiff because this Court's prior determination directed that the ordinary rules of negligence apply in this case and plaintiff was on notice that an expert affidavit would be submitted in support of the Port Authority's motion.
Further, the argument that the Port Authority was acting in its proprietary capacity is the principal ground relied on by plaintiff in support of her complaint and in response to the Port Authority's prior motion to dismiss (see California Suites, Inc. v Russo Demolition Inc., 98 AD3d 144, 156 [1st Dept 2012] ["parties are accorded great latitude in how they conduct litigation and 'may to a large extent chart their own procedural course through the courts'"], quoting Stevenson v News Syndicate Co., 302 NY 81, 87 [1950]; see also J. D'Addario & Co., Inc. v Embassy Indus., Inc., 20 NY3d 113, 119 [2012] ["'parties to a civil dispute are free to chart their own course . . . . '"], quoting Town of Orangetown v Magee, 88 NY2d 41, 54 [1996]). For plaintiff to now argue that she did not consider making arguments under the principles of ordinary negligence [*5]is disingenuous (see Rogoff v San Juan Racing Assn., 54 NY2d 883, 885 [1981]). Plaintiff's strategy, whether successful or not, was a tactical decision that plaintiff chose to pursue notwithstanding the procedural posture of the case and the alternative options at her disposal, despite being on notice of the Port Authority's experts and in light of this Court's prior determination.
The gravamen of plaintiff's argument is that the Port Authority was aware that the GWB was a "suicide magnet" and it failed to maintain the GWB in a "reasonably safe condition by negligently failing to install suicide barriers along the walkways" (Feldman, 194 AD3d at 139, 142). These allegations, which concern the "construction, operation, and maintenance of the bridge[,] are analogous to roadway planning, design, and maintenance, and implicate the proprietary functions of a governmental entity" (Perlov v Port Auth. of N.Y. & N.J., 189 AD3d 1624, 1628 [2d Dept 2020]). They are therefore subject to the ordinary rules of negligence and the Port Authority can only be found to have breached its nondelegable duty to keep the bridge walkways reasonably safe if it was "made aware of [the] dangerous [bridge] condition and [did] not take action to remedy it" (Brown v State of New York, 31 NY3d 514, 519 [2018], quoting Friedman v State of New York, 67 NY2d 271, 286 [1986]). Thus, the relevant inquiry here is whether the Port Authority, after being placed on notice of prior deaths by suicide, established that it took "reasonable steps in a reasonable amount of time" to alleviate the dangerous condition (id. at 520).
The Court of Appeals has noted that when an analysis of a hazardous condition results in the formulation of a remedial plan, "a reasonable delay justified by design considerations, as with one resulting from legitimate claim of funding priorities, would not be actionable" (Friedman, 67 NY2d at 287). However, the Court has also held that "an unjustifiable delay in implementing the plan constitutes a breach of the municipality's duty to the public" (id. at286). Therefore, in determining the reasonableness of the Port Authority's actions here, we must consider in this instance whether it has demonstrated that the delay between its recognition of the hazardous condition and installing the temporary barriers was warranted "to study and formulate a reasonable safety plan, that the delay was itself part of a considered plan of action taken on the advice of experts, or that the delay stemmed from a legitimate ordering of priorities with other projects based on the availability of funding" (cf. id. at 287).
Guided by the above precedent, and in light of the procedural posture of this appeal, we find that the Port Authority met its prima facie burden on summary judgment. The Port Authority's experts established, without challenge, that there is no industry standard concerning the height or design for the handrailing on the bridge and that under the circumstances of this [*6]case—namely, the complexity, age, and scale of the GWB—it took both reasonable and timely steps to help prevent deaths by suicide (see Brown, 31 NY3d at 520; J. H. V. v Locust Val. Cent. Sch. Dist., 212 AD3d 865, 866 [2d Dept 2023] ["[t]he defendant made a prima facie showing of its entitlement to judgment as a matter of law . . . by submitting, inter alia, an affidavit from an expert demonstrating that the surface of the playground . . . conformed to good and accepted safety standards, and was maintained in a reasonably safe condition"]).
As relevant, Mr. Gorman discussed in his affidavit the significant rehabilitation project commenced at the GWB prior to decedent's death, and the preventative measures taken by the PAPD to reduce the number of deaths by suicide at the GWB. Mr. Gorman's affidavit noted that the railings on the upper-level of the GWB pedestrian walkways, as they existed prior to the rehabilitation project, were reasonably safe and met the required standards for their intended purpose as per New York State and New Jersey Department of Transportation standards, the American Association of State Highway and Transportation Officials Roadside Design Guide and that there are no known standards that require railings or barrier systems taller than these standards.
Mr. Gorman also opined that the Port Authority's planning, design, testing, development, and ultimate implementation of temporary fencing on the bridge was reasonable. In support of this assertion, Mr. Gorman highlighted the age, function, and historical significance of the bridge, and explained each factor's respective impact on the engineering study required to modify the 100-year-old structure to install higher fences and avoid unnecessary risk to the safety of millions of road users.
Specifically, Mr. Gorman noted that the modification to the bridge's railings was not a "replacement in kind" and required review and approval by both the New York State and New Jersey Historic Preservation Offices. The project also required static and dynamic testing to quantify the aerodynamic characteristics associated with the three proposed configurations to replace the existing pedestrian railing with fences. It required, amongst other things, wind tunnel testing to determine if the higher fencing would lead to "significant vortex induced vibrations [and/or] critically low flutter wind speeds" that could impact the structural integrity of the bridge. These tests were performed from February 2015 through December 16, 2015, and a final report was issued in December 2015. Wind tunnel testing determined that a chain-link type of fence would not adversely affect the performance of the bridge and the Port Authority then began designing a prototype temporary deterrent fencing system. This process included construction plans, revisions, the production of full-size mockups and culminated with the final work order being approved on March 22, 2017.
Mr. Gorman further opined that the rehabilitation [*7]and modification of the nearly 100-year-old GWB was a monumental undertaking and "[i]t would be irresponsible and unreasonable to simply put up a fence or add netting to this historic structure and risk changing the structural stability without applying reasonable engineering [judgment] and working through the processes that were undertaken by the [Port] Authority to develop the current design of the sidewalk fencing for the GWB." Specifically, Mr. Gorman noted that:
"The approximately 8 years from the start of design in 2009 through the start of construction in 2017 and the time required to exercise reasonable engineering judgement for the safety of the millions of people that use the GWB is reasonable and within industry norms for a project with this level of complexity. Failure to exercise proper engineering judgement, perform the required studies, obtain the required approvals, and verify that this nearly 100-year-old structure will not be adversely affected by the added fencing, would put those millions of people at risk as well as risk a significant economic impact of experiencing the bridge's failure due to the modifications."
Mr. Gorman also compared the GWB project to a similar project undertaken on the Golden Gate Bridge for the installation of its suicide netting. As relevant, Mr. Gorman found that the duration of the GWB project, the construction schedule, design timeframe, and testing timeframe were like that of the Golden Gate Bridge project. More importantly, however, Mr. Gorman advised that there is no standard or requirement to provide temporary construction fencing to prevent intentional acts, noting the Golden Gate Bridge project did not install temporary fencing to prevent suicides through the entire length of its main spans.
Mr. Gorman further opined as to the additional temporary measures the Port Authority implemented as proactive safety measures during the rehabilitation project due to the increasing trend of suicides. These measures included additional police academy training on recognizing and interacting with people with suicidal ideations, additional officers, walkway foot patrols, and frequent marked vehicle patrols with officers trained to recognize unusual behavior. In 2012, the PAPD also increased post coverage on the south walkway, adding two posts that patrolled the walkway between the hours of 6 a.m. and 11 p.m., the hours the walkway was open to pedestrian traffic.
In his affidavit, Police Lieutenant John Duffy also commented on the steps the Port Authority implemented, noting that all members of the Port Authority police department were trained to be vigilant for persons lingering the walkways, vehicles stopping on the roadways for no apparent reason, and vehicles circling multiple times. More specifically, Lieutenant Duffy indicated that on and prior to 2017, "the Port Authority assigned police patrols on the [s]outh [w]alkway 7 days per week on the 7 a.m. to 3 p.m. tour and from 3 p.m.-11 p.m. to protect [*8]life and prevent suicides." Lieutenant Duffy also opined that the GWB installed eleven suicide hotline phones on the bridge, four of which are positioned on the south walkway. These phones, which are located within a bright yellow box with a blinking blue light, are assigned a unique phone number and name identification that is used to determine the location of the call, and are monitored by Lifenet, a service provided by the NYC Department of Health and Mental Hygiene. He further noted that the Port Authority also installed 40 suicide prevention signs on the north and south walkways, approximately 150 feet apart, with contact information for CarePlus, a New Jersey healthcare system that focuses on mental illness and suicide prevention, and is instructed to communicate and forward all suicide related calls to the PAPD communications desk.
The Port Authority's experts also highlighted the multitude of security measures in place at the bridge, including the use of security guard personnel trained in suicide awareness and behavior indicators, suicide enforcement and prevention; automated license plate readers to track license plates of emotionally disturbed persons; surveillance cameras to monitor the activity at the GWB; and crisis intervention training. These measures, which were implemented at the same time the Port Authority was undertaking the proactive measure of designing, evaluating, and planning the construction of a taller pedestrian safety fence, resulted in a 10% decrease in suicide events between 2015 and 2016, an 18% reduction in the number of interventions/saves, a 42% decrease in deaths by suicide between 2015 and 2016, and deterred 53 of the 60 attempted suicides in 2016.
The Port Authority contends the above factors establish that it satisfied the only duty it owed to decedent: maintaining the GWB in a reasonably safe condition for its intended use. However, as noted above, the relevant inquiry here is whether on this motion for summary judgment, the Port Authority established prima facie that once on notice of the dangerous condition, it took reasonable measures to prevent a death by suicide within a reasonable amount of time, thereby satisfying its duty to maintain the bridge in a reasonably safe condition (see Brown, 31 NY3d at 520; Kush v City of Buffalo, 59 NY2d 26, 29-30 [1983]). Said differently, had the Port Authority taken reasonable steps to guard against a death by suicide when it implemented a plan which included interim proactive suicide prevention measures during the design, testing, and construction of taller temporary fences and thereby was not a substantial factor in decedent's death by suicide. On this record, it cannot be said that the Port Authority has failed to meet its burden.
We agree with our dissenting colleague that there were prior deaths by suicide at the GWB. Thus, once the Port Authority was on notice of these tragic incidents, it was defendant's burden to take reasonable steps within a reasonable [*9]amount of time to rectify the dangerous condition. To that end, the Port Authority commissioned a report to determine the most effective way to reduce deaths by suicide at the bridge, added the construction of higher fencing to replace the pedestrian railing to an existing rehabilitation project, and engaged in the design, wind tunnel testing, approval, and implementation of temporary fencing on the pedestrian walk way open to the public while the rehabilitation project was being completed. These steps, which defendant's expert opined were necessary due to the GWB's complex construction and its classification as a historical structure, impacted the design and extensive testing required to analyze the impact the safety fencing would have on the aerodynamic stability of the bridge due to wind loading.
While the dissent posits, without affirmative expert opinion support, that under the basic principles of tolerable risk, a 10-to-12-foot-tall fence should have been installed as soon as reasonably practicable, it discounts Mr. Gorman's contentions as to why that occurred here. Instead, the dissent seemingly adopts the position that Mr. Gorman's affidavit is not dispositive because it fails to assert specific language concerning the impracticability of erecting fencing earlier than 2017.
In doing so, the dissent largely ignores the tenor and focus of Mr. Gorman's affidavit. On this issue, Mr. Gorman opined as to the reasonableness of the project duration, indicating that the project time frame was reasonable for a "project the size and complexity of the GWB's rehabilitation project." Mr. Gorman also opined that the "[d]esign, testing, development and ultimately [sic] incorporation of the temporary fencing on the south sidewalk proceeded reasonably and steadily and expeditiously, using existing work orders to start the prototype project, and overlapping the bidding of the of the Rehabilitation project with completion of testing and design of the temporary fence."
Our dissenting colleague also asserts that Mr. Gorman's affidavit fails to establish that it would have been impracticable for defendant to install taller fences promptly after testing found it would be safe to do so. While the dissent does not identify the time frame it believes would constitute a "prompt" installation here, its argument also overlooks the detailed timeline set forth in Mr. Gorman's affidavit.
As relevant, Mr. Gorman notes that testing occurred from February 2015 through December 16, 2015, a final report was issued in December 2015 and the "initial construction plans for the prototype deterrent fencing system . . . was completed and signed September 16, 2016 as Drawings." Shortly thereafter, on September 30, 2016, and "with a means of expediting completion of the prototype deterrent fencing system, the Authority issued Work Order No. 13 under its current Project . . . for the procurement and mockup installation of two-different fence products." The drawing was then revised [*10]on December 6, 2016, "[f]ull sized mock-ups, including connection hardware, fencing, netting, etc. were photographed on December 23, 2016 and January 4, 2017" and the final inspection for the work order was approved on March 22, 2017.
During this same period, in December 2016, the Port Authority bid contract for the GWB restoration project included the installation of a taller pedestrian fence. The contract was awarded on February 23, 2017, and the north walkway was subsequently closed. The Port Authority then finalized its engineering and development of construction drawings for the temporary fence on August 23, 2017, and the contractor was directed to begin construction of the temporary fence on August 25, 2017.
Thus, contrary to the dissent's assertion, Mr. Gorman's unchallenged affidavit specifically outlines the timeline followed by the Port Authority in erecting the appropriate fencing, deeming the steps taken as practicable. This opinion was based on both his expertise in the field and the comparison of the GWB rehabilitation project to the project that took place on the Golden Gate Bridge, a project of a similar scale. Therefore, we conclude that the record supports a finding that defendant met its prima facie burden for summary judgment by establishing it took reasonable measures to prevent deaths by suicide at the GWB.
It is also undisputed that the Port Authority implemented various other nonphysical safety measures to deter suicide attempts during the extensive design, testing, and approval of the temporary fencing, including installing call boxes, suicide help signs, and CCTVs; increasing walkway foot patrols, marked vehicle patrols, officer training, security guard training; and closing the pedestrian walkways during the overnight hours—measures that amounted to 53 of the 60 attempted suicides at the GWB being prevented in 2016. While a "governmental entity's conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions" (Miller v State of New York, 62 NY2d 506, 511-512 [1984]), our considerations here are not limited only to whether a fence was put in place, but also whether the Port Authority "took any steps whatsoever to attempt to improve safety" on the pedestrian walkways after being placed on notice (Brown, 31 NY3d at 520). Thus, as these interim nonphysical safety measures were part of the remedial plan implemented, they can be considered when determining the actions taken by the Port Authority to improve the safety of the pedestrian walkways.
The above findings show that defendant not only addressed the theory of liability raised by plaintiff, but established its prima facie burden, thereby shifting the burden to plaintiff. In response, plaintiff failed to raise a triable issue of fact as to the reasonableness of the steps taken by the Port Authority to prevent suicides or the time it took to implement such measures. As we noted in our prior determination[*11], plaintiff's allegation here is that the Port Authority "failed to maintain the GWB in a reasonably safe condition by negligently failing to install suicide barriers along the walkways to prevent suicides" (Feldman, 194 AD3d at 142). More specifically, plaintiff contends that the existing four-foot railing was insufficient to prevent suicide attempts on the bridge and the Port Authority should have taken more action to prevent the foreseeable harm to individuals with suicidal ideations. However, plaintiff failed to submit an expert affidavit to controvert the Port Authority's submissions on the reasonableness of its actions during the planning, design, study, testing, investigation, approval, and construction of either the temporary or permanent fencing on the bridge. Plaintiff itself even characterizes the steps taken by defendant as reasonable in its appellant brief ("even though it [eventually] began to take reasonable steps").
Plaintiff also failed to refute the Port Authority's experts' assertion that there is no authority, treatise, standard, building code, or other corroborating evidence that required the installation of a higher railing when the bridge was constructed (see Buchholz v Trump 767 Fifth Ave., LLC, 5 NY3d 1, 8-9 [2005]). While this failure is not dispositive here (see Maldonado v 1992 Fulton Realty Corp., 23 AD3d 177, 177 [1st Dept 2005]), taken together, plaintiff's contentions can only be deemed as speculative and conclusory and insufficient as a matter of law to overcome defendant's motion for summary judgment.
Again, we are not faced with a circumstance where plaintiff's opposition includes a conclusory expert affirmation averring that the failure to install higher fencing violated an industry standard or was a substantial factor in decedent's death by suicide. Even then, however, conclusory assertions would not suffice as expert assertions that are speculative or unsupported are to "be given no probative force and is insufficient to withstand summary judgment" (Buchholz, 5 NY3d at 9, citing Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002] [internal quotation marks omitted]; Verderese v 3225 Realty Corp., 147 AD3d 637, 638 [1st Dept 2017]; Amatulli v Delhi Constr. Corp., 77 NY2d 525, 533 n 2 [1991] ["[w]here the expert states his conclusion unencumbered by any trace of facts or data, his testimony should be given no probative force whatsoever . . . [i]ndeed, no reason is apparent why his testimony should not simply be stricken"] [internal quotation marks omitted]; see also Hotaling v City of New York, 55 AD3d 396, 397-398 [1st Dept 2008], affd 12 NY3d 862 [2009]; Timmins v Tishman Constr. Corp., 9 AD3d 62, 69-70 [1st Dept 2004], lv dismissed 4 NY3d 739 [2004]).
Thus, while it is true that much of the Port Authority's motion was addressed to rehashing the arguments made on its motion to dismiss and in support of its position that governmental immunity exists, contrary to the dissent's reasoning, this factor alone [*12]does not mean that the Port Authority failed to meet its initial burden under the principles of ordinary negligence. Instead, we find that the Port Authority clearly established that it took various steps to address the deaths by suicide that were occurring on the bridge and asserted its position under governmental immunity and ordinary negligence, establishing its prima facie burden under the latter.
Plaintiff's response simply contends that the Port Authority delayed installing a safety fence that would have prevented decedent's death. However, whereas here, the Port Authority has submitted an expert affidavit attesting to the reasonableness and timeliness of the steps it has taken, plaintiff's objective contention that the delay was unreasonable, without more, is insufficient to raise an issue of fact (see Friedman, 67 NY2d at 287 ["a reasonable delay justified by design considerations . . . would not be actionable"]). Accordingly, Supreme Court's order granting Port Authority's motion for summary judgment and dismissing the complaint should be affirmed.
We also find that Supreme Court's order denying plaintiff's motion to vacate the note of issue should be affirmed as plaintiff failed to make the motion within 20 days of filing the note of issue. Plaintiff's motion was filed six months late, and the outstanding discovery was attributable to plaintiff's own inaction (see Allen v Hiraldo, 144 AD3d 434, 435 [1st Dept 2016]). Under these circumstances, we do not elect to substitute our discretion for that of the trial court because plaintiff has not shown good cause for the delay.
We also find that plaintiff has abandoned her appeal from Supreme Court's order which denied leave to renew her opposition to the Port Authority's motion for summary judgment (see e.g. Lanza v B.H.N.V. Realty Corp., 201 AD3d 468, 470 [1st Dept 2022]). Therefore, plaintiff's appeal from Supreme Court's November 3, 2023 order should be dismissed.
Conclusion
Accordingly, the order of Supreme Court, New York County (Arlene P. Bluth, J.), entered on or about July 7, 2023, which granted defendant's motion for summary judgment dismissing the complaint should be affirmed, without costs. The order of the same court and Justice, entered on or about July 7, 2023, which denied plaintiff's motion to vacate the note of issue should also be affirmed, without costs. The appeal from the order of the same court and Justice, entered on or about November 3, 2023, which, to the extent appealed from, denied plaintiff's motion for leave to renew her opposition to defendant's motion for summary judgment, should be dismissed, without costs, as abandoned.
All concur except Gesmer, J. who dissents in a separate Opinion:

GESMER, J. (dissenting)

I respectfully disagree with the majority. The record is clear that defendant did not argue to the motion court that it was not liable under the ordinary rules of negligence. Rather, defendant argued only that it was entitled to governmental immunity[*13]. Both the motion court and the majority fault plaintiff for not providing expert testimony to show that defendant was liable under the ordinary rules of negligence - that is, for failing to refute an argument that defendant never made. Plaintiff was prejudiced by the motion court's decision to grant summary judgment on a theory defendant never argued and in fact, continues to deny applies in this case despite this Court's finding to the contrary in an earlier appeal (Feldman v Port Auth. of N.Y. & N.J., 194 AD3d 137, 141-142 [1st Dept 2021]). Furthermore, I would find that nothing in defendant's motion papers, including its engineer's affidavit, resolves as a matter of law whether defendant acted reasonably in waiting for approximately two years after it knew it could safely install suicide barriers along the pedestrian walkways which would have effectively prevented the increasingly frequent suicide deaths of which it was aware. Accordingly, I respectfully dissent.
At approximately 6:30 a.m. on July 26, 2017, decedent Andrew Donaldson, a 49-year-old architect and father of two, died by suicide after walking along the George Washington Bridge (GWB), climbing over the four-foot-tall pedestrian railing, and jumping. In April 2018, Mr. Donaldson's widow, as administrator of decedent's estate and on behalf of their children, commenced this action against the Port Authority of New York and New Jersey. The complaint alleges that defendant failed to maintain the bridge in a reasonably safe condition by negligently failing to install suicide prevention barriers along the pedestrian walkways.
The Port Authority moved to dismiss the complaint. The motion court granted that motion, finding that decedent's suicide was not reasonably foreseeable. On appeal, this Court reversed, finding that "[t]he intentional act[] of [decedent] in jumping from the bridge [is] "the foreseeable harm that shapes the duty imposed." We then held that defendant was acting in a proprietary capacity in the design and maintenance of the bridge, and that it is thus subject to suit under the ordinary rules of negligence and not entitled to governmental immunity (Feldman, 194 AD3d at 141-142). This Court further found that the complaint "does not implicate [Port Authority's] policing function. There are no allegations that the Port Authority failed to provide protection and security. Rather, the allegation is that it failed to maintain the GWB in a reasonably safe condition by negligently failing to install suicide barriers" (id. at 142).
On March 15, 2023, Port Authority filed the motion for summary judgment now before us. In its memorandum in support of its motion, defendant made only two arguments: (1) it was acting in a governmental capacity in its operation of the bridge, and was therefore entitled to governmental immunity; and (2) permitting plaintiff to proceed would expand defendant's liability costs. In support of its motion, defendant argued vigorously that this Court's order [*14]in Feldman was "wrongheaded[]" and "flawed." Defendant continued to insist that it was entitled to governmental immunity, and did not make any argument that it was entitled to summary judgment under the standard of ordinary negligence.[FN1] Nonetheless, the motion court applied the standard of ordinary negligence to grant summary judgment to defendant.
I would reverse and find that Supreme Court erred in granting defendant's motion based on a theory that defendant did not raise. Defendant argued only that it was entitled to governmental function immunity, and that it had no duty to people who die by suicide, including plaintiff's decedent. As a result, defendant did not cite any facts in its memorandum of law in support of its motion demonstrating that it had met its duty to plaintiff's decedent to construct, operate, and maintain the bridge so as to prevent individuals like plaintiff's decedent from dying by suicide.
There is no question that our prior decision established as the law of the case that defendant's obligations must be measured under the rules of ordinary negligence. Nonetheless, defendant did not make this argument in support of its motion. As we have previously held, where, as here, on a motion for summary judgment defendant fails to address a theory of liability previously raised by plaintiff, "the burden never shift[s] to plaintiff to raise an issue of fact" (Valenti v Camins, 95 AD3d 519, 522 [1st Dept 2012]).[FN2] Accordingly, plaintiff here was not required to raise an issue of fact as to whether defendant is liable on a theory of ordinary negligence.[FN3]
Plaintiff was prejudiced by the motion court's determination of an issue defendant did not raise: whether and under what facts defendant might escape liability under the ordinary rules of negligence. Plaintiff cannot be expected to guess which facts defendant might assert to support summary judgment in its favor under a theory defendant continued to insist did not apply. The motion court's determination of the motion on a ground defendant did not argue poses "an obvious problem of fair play," as plaintiffs were entitled under basic principles of due process to have the opportunity to refute the proposition on which the motion court and the majority grant summary judgment (Misicki v Caradonna, 12 NY3d 511, 519 [2009]["We are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made"]).
The motion court and the majority rely heavily on the affidavit of defendant's engineer Kevin V. Gorman, and, to a lesser extent, on the affidavit of Port Authority Police Lieutenant John Duffy.[FN4] Both fault plaintiffs for not having submitted an expert affidavit in opposition to the motion. On the sole occasion when defendant mentioned either affidavit to the motion court, it relied on the Gorman affidavit to support its argument that it was entitled to governmental immunity. However, plaintiffs [*15]had no reason to rebut that argument by means of an expert affidavit addressing factual matters, since defendant was asserting a legal argument that had already been determined against defendant by this Court and is now the law of this case, notwithstanding defendant's insistence to the contrary.[FN5]
Furthermore, even if defendant had argued that it was not liable under a theory of ordinary negligence, I would find that the Gorman and Duffy affidavits fail to resolve that issue in defendant's favor as a matter of law. "[I]t is well established that a [government actor] has a proprietary duty to keep its roads and highways in a reasonably safe condition" (Wittorf v City of New York, 23 NY3d 473, 480 [2014]). The foreseeability of the harm at issue is an aspect of the scope of the duty, since "[t]he risk reasonably to be perceived defines the duty to be obeyed" (Powers v 31 E 31 LLC, 24 NY3d 84, 94 [2014] [internal quotation marks omitted]). "Once on notice of [a] dangerous condition, it [is defendant's] burden to take reasonable steps in a reasonable amount of time" (Brown v State, 31 NY3d 514, 520 [2018]). Accordingly, for defendant here to be entitled to summary judgment it would have to demonstrate that there are no issues of fact requiring a trial as to defendant's awareness of a foreseeable risk of harm and that defendant took reasonable steps in a reasonable amount of time under the circumstances to address it.
The majority agrees that defendant was on notice of the risk of suicide deaths from the GWB. In his affidavit, Gorman admits that defendant was aware by 2012 of "increased numbers of suicide events" and a "rising trend in suicides from the GWB." Accordingly, the Gorman affidavit establishes that defendant was aware of a rising risk of suicides at least as early as 2012.
The Gorman and Duffy affidavits fail to establish as a matter of law that defendant took reasonable steps in a reasonable amount of time to address this foreseeable risk. Gorman notes that, in 2013, the GWB Bike/Walkway Safety Program Report "recognize[d] that general heights of safety fence are in the 10-foot to 12-foot height range." It is undisputed that the GWB pedestrian walkways had four foot high railings in July 2017 when decedent died.
Gorman asserts that "[t]he most effective safety measures are preventative and are less 'defeatable' by peoples' actions; less effective are contingent measures that rely on human performance." He notes that the National Safety Council's examples of "preventative measures" include "[e]liminat[ing] or reduc[ing] risks/dangerous condition." He also cites an article from CE Magazine of the American Society of Civil Engineers that provides the following guidance:
"The basic principles of tolerable risk hold that human safety is paramount, that risk cannot be ignored, and that absolute safety cannot be guaranteed. Our goal should be to reduce risk to a level that is as low as reasonably practicable."
Accordingly, the Gorman affidavit [*16]supports the conclusion that defendant was aware by 2013 that the most effective deterrent to the rising number of suicide attempts on the GWB would be the erection of 10-to-12-foot-tall fencing along the pedestrian walkway, and that, under the basic principles of tolerable risk, this should have been done as soon as it was reasonably practicable to do so.[FN6]
The majority finds that defendant acted reasonably by taking any steps at all to address the increasing number of suicide attempts.[FN7] However, "[w]hen . . . analysis of a hazardous condition by the municipality results in the formulation of a remedial plan, an unjustifiable delay in implementing the plan constitutes a breach of the municipality's duty to the public just as surely as if it had totally failed to study the known condition in the first instance" (Friedman v State, 67 NY2d 271, 286 [1986]). Here, Gorman makes no claim that it would have been impracticable for defendant to erect the appropriate fencing earlier than 2017. To the contrary, he states that defendant completed necessary testing on wind and other safety issues in 2015, and that the results demonstrated that it was feasible to erect taller fencing along the pedestrian walkway.[FN8] He fails to explain why it was reasonable for defendant to wait for approximately two years—until several months after decedent died—to install even temporary fencing. His discussion of the magnitude of the overall GWB rehabilitation project fails to establish that it would have been impracticable for defendant to install taller fencing promptly after testing established it could be installed safely, rather than waiting approximately two more years to do so. Gorman did not claim, for example, that other work had to be completed before the fencing could be installed or defendant lacked the necessary funds prior to 2017 (see Peralta v Henriquez, 100 NY2d 139, 144 [2003] [determination of whether a landowner has acted reasonably in preventing foreseeable harm must be made "in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk"] [internal quotation marks omitted]; Friedman, 67 NY2d at 287 [defendant failed to demonstrate that delay "stemmed from a legitimate ordering of priorities with other projects based on the availability of funding"]).[FN9] The motion court and the majority also rely on the descriptions in the Gorman and Duffy affidavits of efforts by the Port Authority Police to prevent suicides. However, as this Court has already found, plaintiff's complaint does not allege that defendant failed to provide protection and security, and thus does not implicate defendant's policing function. "Rather, the allegation is that [defendant] failed to maintain the GWB in a reasonably safe condition by negligently failing to install suicide barriers along the walkways to prevent suicides" (Feldman, 194 AD3d at 142).[FN10]
Accordingly, were the issue of defendant's liability [*17]under ordinary negligence principles before us, I would find that the Duffy and Gorman affidavits are not dispositive.
I agree with the majority that plaintiff has abandoned her appeal from the order entered on or about November 3, 2023, which denied leave to renew plaintiff's opposition to defendant's summary judgment motion, as she makes no arguments about that order in her appeal briefs (see e.g. Lanza v B.H.N.V. Realty Corp., 201 AD3d 468, 470 [1st Dept 2022]).
However, for the reasons stated above, I would reverse the award of summary judgment to defendant. Accordingly, under the circumstances of this case, I would elect to substitute our discretion for that of the trial court and grant plaintiff's motion to vacate the note of issue (see 22 NYCRR 202.21[e]; Those Certain Underwriters at Lloyds, London v Occidental Gems, Inc., 11 NY3d 843, 845 [2008]). In the certificate of readiness for trial, plaintiff struck out the items addressing completion of discovery and readiness for trial, and stated in a handwritten notation that "Party and non-party discovery incomplete." Defendant has not claimed either that plaintiff's modifications to the certificate of readiness were untrue or that discovery was completed. Thus, because a material fact in the certificate of readiness was incorrect, vacatur of the note of issue beyond the 20-day time limit is justified (22 NYCRR 202.21[e]).
Order, Supreme Court, New York County (Arlene P. Bluth, J.), entered on or about July 7, 2023, affirmed, without costs. Order, same court and Justice, entered on or about July 7, 2023, affirmed, without costs. Appeal from order, same court and Justice, entered on or about November 3, 2023, dismissed, without costs, as abandoned.
Opinion by Pitt-Burke, J. All concur except Gesmer, J. who dissents in a separate Opinion.
Kern, J.P., Gesmer, Pitt-Burke, O'Neill-Levy, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: May 6, 2025

Footnotes

Footnote 1: The majority views certain language in defendant's moving affirmation as constituting an argument based on ordinary negligence. However, the language quoted in the majority opinion was submitted in support of defendant's argument that it owed no duty to plaintiffs' decedent because any failures alleged "relate to the governmental function of providing safety and security," for which defendant "should not be held responsible . . . absent a special relationship." Indeed, the motion court found that defendant had argued only "that it is entitled to governmental function immunity . . . . [,] it owed no special duty to the decedent as opposed to the public generally . . . . [and] insists that the Appellate Division's decision denying defendant's motion to dismiss is not the law of the case . . . ." (Donaldson v Port Auth. of N.Y. & N.J., 2023 WL 4363462, *1-2, 2023 NY Misc LEXIS 23416, *1-3 [Sup Ct, NY County, July 5, 2023, index No. 153624/18]).
Footnote 2: Defendant's failure in this case is more extreme than Valenti, because here defendant fails to address the sole theory of liability now recognized by our Court in this case. The majority cites Valenti for the proposition that a party may raise even an unpleaded issue on summary judgment where the other party is not taken by surprise and does not suffer prejudice (95 AD3d at 522). However, in my view, that legal concept does not apply here, as defendant failed to address the issue of its liability under ordinary negligence principles in its motion for summary judgment, and failed to cite to any factual basis to support its claim that it was free from liability under ordinary negligence principles. Indeed, although defendant attached two affidavits to its motion, it cited only to the engineer's affidavit, and then merely once and solely to establish the number of cars that cross the bridge on an average day. In contrast, in Valenti, the specific factual bases for plaintiff's theory of medical malpractice liability, the improper insertion of orthopedic hardware at a specific spinal level, had been the subject of "numerous questions at the depositions" of defendant doctor and the non-party physician who assisted in the procedure at issue (Valenti, 95 AD3d at 522). As a result, this Court held that defendant in Valenti was not entitled to summary judgment because it was on notice of this theory of liability and its factual bases, but failed to address them in its moving papers.
Footnote 3: The majority cites to California Suites, Inc. v Russo Demolition Inc. (98 AD3d 144, 156 [1st Dept 2012] [where all parties treated defendant's motion to dismiss as one for summary judgment, the court properly granted summary judgment to defendant]) and Rogoff v San Juan Racing Assn. (54 NY2d 883, 885 [1981] [summary judgment properly granted based on an unpleaded defense where the issue was fully argued by both parties to the motion court]) for the proposition that parties are free to chart their own procedural course. I agree with that proposition, but would find that that it weighs against defendant here, who chose to base its motion on a theory of governmental immunity which is barred by the law of the case. Respectfully, the cases cited by the majority holding that an appellate court may grant summary judgment to a non-movant are not relevant to this case (Chateau D'If Corp. v City of New York, 219 Ad2d 205, 209-210 [1st Dept 1996], lv denied 88 NY2d 811 [1996]; Grimaldi v Pagan, 135 AD2d 496, 496-497 [1st Dept 1987] [both relying on CPLR 3212(b), which permits a court to grant summary judgment to a non-movant where appropriate]).
Footnote 4: Mr. Gorman set forth his credentials as an engineering expert. He is not a suicide prevention expert. Lieutenant Duffy is a fact witness and does not provide any expert opinion.
Footnote 5: The fact that defendant cited only once to the engineer's affidavit, and then merely to establish the number of cars that cross the bridge on an average day, demonstrates the difficulty that plaintiff would have faced in guessing which statements in defendant's expert affidavit defendant might consider relevant to an argument defendant never made. In my view, faulting plaintiff for not going through this exercise contravenes basic principles of due process.

Footnote 6: As discussed above, each of the bases for this conclusion is set forth in defendant's engineer's affidavit, contrary to the majority's assertion.
Footnote 7: The majority cites to Brown v State (31 NY3d 514) in support of its approach. However, Brown focused on the issue of proximate cause, and held, as relevant to this case, "[w]here, as here, the risk of harm created by the defendant corresponds to the harm that actually resulted, we cannot say that proximate cause is lacking as a matter of law" (id. at 520).
Footnote 8: The majority finds that the Gorman affidavit establishes that "engineering concerns" justified defendant's inaction prior to 2017. However, the only engineering concern relevant to erecting taller pedestrian fencing that Gorman identifies is the need for wind testing, which was completed in 2015.
Footnote 9: The majority recites aspects of the timeline for installation of suicide prevention fencing. However, Gorman does not explain why it was reasonable for defendant to take a year after wind testing was completed to finalize initial construction drawings for fencing, several more months to issue a work order, nearly a year after that to award a contract and close the north walkway, and several more months to begin construction on the north walkway. Plaintiff's decedent jumped from the south walkway, which remained open.
Footnote 10: Moreover, to the extent that the steps taken by defendant prior to 2017 are relevant to plaintiff's claim, the Gorman and Duffy affidavits do not establish that Port Authority Police training and patrols, posters and hotline phones were reasonably effective under the circumstances in preventing suicides. Indeed, as the majority notes, in 2016 suicide deaths decreased by only 42% and seven people died by suicide that year. Furthermore, the Gorman and Duffy affidavits contradict each other as to the times PA police patrolled the bridge, the presence of security guards, and when the pedestrian walkway was closed, thus raising yet more questions of fact.